Keith J. Miller, Esq.
**ROBINSON MILLER LLC**
One Newark Center, 19th Floor
Newark, New Jersey 07102
Telephone: 973-690-5400
Facsimile: 973-466-2761
kmiller@rwmlegal.com
*Attorneys for Defendants*
*Doggone Geese, Inc. and Cathy P. Benedict*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GPI, LLC, | Civil Action No.:  3:18-cv-5122 (FLW) (TJB) |
| Plaintiffs, | *Document electronically filed* |
| vs. | **DECLARATION OF CATHY P. BENEDICT.** |
| DOGGONE GEESE, INC. AND CATHY P. BENEDICT, | **IN SUPPORT OF OPPOSITION TO APPLICATION TO SHOW CAUSE PURSUANT TO FED. R. CIV. PRO. 65** |
| Defendants. | |

CATHY P. BENEDICT, of full age, declares:

1.      I am an individual residing in Leesburg, Virginia.

2.      I have been involved in humane geese control, working with and training dogs (typically border collies) since at least 1999.

3.      To the best of my knowledge and belief, I did not re-execute any guarantee with GPI, LLC other than the two titled Exhibit C in 2003 and 2009.

4.      I did not want to re-sign personally in 2014 with GPI, LLC.  I had numerous personal problems with the ownership of GPI, LLC that continued to worsen during that time. As a result, there was no new document executed by me personally during the 2014 renewal period intentionally.

5.     To the best of my recollection, the screenshots contained in the February 8, 2018 letter were taken from advertisements posted on or about November 2017.

6.     Geese Police does not sell dogs.  There is absolutely no service offering of GPI, LLC that sells dogs or offers to train dogs.  None.  When a franchisee starts, GPI, LLC will sell a dog to a franchisee when they get started.  However, there is no other dog sales to any third party at all.  On at least one recent phone call with a majority of the franchisees, GPI, LLC management proclaimed "we are not in the business of selling dogs!"

7.     GPI, LLC and all its Geese Police franchisees entire client service solely involve chasing geese away from a client's facility with a dog.

8.     Geese Police is not in the business of selling or training dogs for customers.

9.     Prior to the February 8, 2018 letter from GPI, LLC, neither DGI nor I had any idea that we were being terminated or that GPI, LLC perceived the sale of dogs as being a violation of the agreement.

10.     After speaking with my customers, it appears that GPI, LLC instructed another Franchisee owner, by the name of Doug Marcks, the nephew of Dave Marcks (owner of GPI), to systematically contact DGI's customers, instruct them to stop all work with DGI, and begin work with Doug Marcks and his franchise.

11.     Prior to the February 8, 2018 letter from GPI, LLC, I had seen the two owners at a service dog related event.  During that event, both owners became irate, using profanity and screaming at me.  During that occasion amongst other things they specifically stated, "we are going to kick you out of this f—king company."  "We are sick of your bulls—t."  "F—k you." "You need to know when to shut the f—k up and stop causing problems."  All of which stemmed from complaints made by myself and other franchisees regarding uniforms and other compliance

issues the franchisees were actually having with the franchisor.

12.     In 2017 and 2018, I was working with an organization called Keepstone Farms, and involved in the training of dogs, including herding instincts for sheep, ducks, geese, and other domestic animals.  In addition to training services, Keepstone Farms also sold dogs. DGI had absolutely no involvement, at all.

13.     Prior to August 31, 2016, neither I, nor DGI for that matter, had sold any dog to a customer, prospective customer, competitor, non-Geese Police related entity, or vendor of DGI or the Geese Police franchisees ("Third Parties").

14.     It was not until 2017 that I (individually), again, without involving DGI, advertised and/or sold dogs to Third Parties in conjunction with Keepstone Farms.

15.     Prior to 2017, I was not involved in the active advertising for the sale of dogs, and, in fact, had only ever sold dogs to Geese Police Franchisees.

16.     DGI has never been involved in the advertisement or sale of dogs to any Third Parties.

17.     On or around December 6, 2017, I received the audit result and response from GPI, LLC.  Upon receipt I very quickly wrote back to them indicating that I agreed.  I then immediately complied with the agreement and followed it to the letter.

18.     As of March 31, 2018 DGI, and I, have ceased all use of the Geese Police Trademarks/Service marks.

19.     All vehicle markings have been removed and the website has been taken down. To the best of my knowledge, all items brandishing a Geese Police trademark/service mark or logo have been removed or taken down.

20.     All customers of DGI have been notified of the situation and have been apprised

that DGI will no longer be providing services as Geese Police Franchisee.

21.     DGI has kept all of its information for purposes of this lawsuit, but is otherwise not using or attempting to use any documents, contracts, or information provided by GPI.

22.     On March 30, 2018, I created the entity Goose Rangers, LLC, and, Goose Rangers, LLC has begun to operate and promote itself and service using that brand.

23.     Goose Rangers, LLC has no relationship to DGI, which has ceased all operations as a result of the actions of GPI.

24.     The service provided by Geese Police requires both handlers experienced with geese control working in conjunction with the animal.

25.     These dogs do not receive any specialized training specific to GPI or the franchisees.

26.     The nature of the service provided by DGI and Geese Police requires that customers are often serviced daily, or, at least, multiple times a week at a set on site location.

27.     The document identified as 2009 Exhibit C in our Opposition, was executed by me in Virginia and I mailed it to GPI in New Jersey with the incomplete notarization section. Nicole Jeffers was an administrative assistant to GPI, LLC in New Jersey.  I never discussed the notarization with them and did not instruct anyone to notarize the document separately.

28.     Attached hereto as Defendants' Exhibit 1 ("DEX 1") a true and accurate copy of the 2009 Franchise Agreement.

29.     Attached hereto as Defendants' Exhibit 2 ("DEX 2") a true and accurate copy of the 2009 Exhibit C.

30.     Attached hereto as Defendants' Exhibit 3 ("DEX 3") a true and accurate copy of the 2014 Franchise Renewal Agreement.

31.     Attached hereto as Defendants' Exhibit 4 ("DEX 4") a true and accurate copy of the February 8, 2018 Termination Letter from GPI, LLC.

32.     Attached hereto as Defendants' Exhibit 5 ("DEX 5") a true and accurate copy of the February 22, 2018 Letter from DGI and Ms. Benedict (REDACTED IN PART).

33.     Attached hereto as Defendants' Exhibit 6 ("DEX 6") a true and accurate copy of the March 6, 2018 Letter from GPI, LLC.

34.     Attached hereto as Defendants' Exhibit 7 ("DEX 7") a true and accurate copy of the March 19, 2018 Letter from GPI, LLC to Franchisees.

35.     Attached hereto as Defendants' Exhibit 8 ("DEX 8") a true and accurate copy of the GPI Website Screenshot.

36.     Attached hereto as Defendants' Exhibit 9 ("DEX 9") a true and accurate copy of the Screenshot of the google Definition of renew.

37.     Attached hereto as Defendants' Exhibit 10 ("DEX 10") a true and accurate copy of the March 19, 2018 Letter from Mr. Marcks to DGI clients.

38.     Attached hereto as Defendants' Exhibit 11 ("DEX 11") a true and accurate copy of the December 6, 2017 Letter from GPI, LLC to DGI and Ms. Benedict.

39.     Attached hereto as Defendants' Exhibit 12 ("DEX 12") a true and accurate copy of the DGI and Ms. Benedicts email response to the December 6, 2017 letter.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 24, 2018

Cathy P. Benedict

# DEX 1

# GPI, LLC

# FRANCHISE AGREEMENT

## TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1 | GRANT | 2 |
| 2 | TERM AND RENEWAL | 4 |
| 3 | DUTIES OF FRANCHISOR | 5 |
| 4 | FEES | 6 |
| 5 | TRAINING | 6 |
| 6 | DUTIES OF FRANCHISEE | 7 |
| 7 | PROPRIETARY MARKS | 7 |
| 8 | OPERATING MANUAL | 10 |
| 9 | CONFIDENTIAL INFORMATION | 12 |
| 10 | ACCOUNTING AND RECORDS | 13 |
| 11 | ADVERTISING, MARKETING AND PROMOTION | 13 |
| 12 | INSURANCE | 14 |
| 13 | TRANSFER OF INTEREST | 16 |
| 14 | DEFAULT AND TERMINATION | 17 |
| 15 | OBLIGATIONS UPON TERMINATION OR EXPIRATION | 21 |
| 16 | COVENANTS NOT TO COMPETE | 23 |
| 17 | CORPORATE, PARTNERSHIP OR LIMITED LIABILITY COMPANY FRANCHISEE | 25 |
| 18 | TAXES, PERMITS, AND INDEBTEDNESS | 27 |
| 19 | RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION | 29 |
| 20 | APPROVALS AND WAIVERS | 29 |
| 21 | NOTICES | 31 |
| 22 | MISCELLANEOUS | 31 |
| 23 | SEVERABILITY AND CONSTRUCTION | 32 |
| 24 | GRANT OF SECURITY INTEREST | 32 |
| 25 | APPLICABLE LAW; DISPUTE RESOLUTION | 33 |
| 26 | ACKNOWLEDGMENTS | 34 |
| | | 36 |

EXHIBIT A -- SITE SELECTION ADDENDUM

EXHIBIT B -- ADA CERTIFICATION

EXHIBIT C -- GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

# GPI, LLC
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), is made and entered into on August 31, 2009 by and between GPI, LLC, a New Jersey limited liability company with its principal place of business at 126 South Main Street, Farmingdale, New Jersey 07727 ("Franchisor") and **Dog Gone Geese, Inc. d/b/a Geese Police of Virginia**, a limited liability corporation with its principal place of business at **P.O. Box 2608,** ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯**, Leesburg, VA 20175** ("Franchisee").

**REDACTED**

### WITNESSETH:

WHEREAS, Franchisor's affiliate, as the result of the expenditure of time, skill, effort, and money, has developed a distinctive system relating to the establishment and operation of a Canada goose control services franchise, which specializes in providing environmentally-safe Canada goose control services using working Border Collies and other proprietary strategies and techniques, and other related products and services (the "System"), and has licensed to Franchisor the right to use, and license others to use, the System;

WHEREAS, the distinguishing characteristics of the System include, without limitation, proprietary Canada goose herding and harassment strategies and techniques; distinctive uniforms and color scheme; standards and specifications for Border Collie pedigree, training, care, and grooming; uniform standards, specifications, and procedures for operations, equipment, and supplies; standards and procedures for business management and control; training and assistance; and advertising and promotional programs; all of which may be changed, improved, and further developed by Franchisor from time to time;

WHEREAS, the System is identified by means of certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, but not limited to, the mark "Geese Police" plus design, as are now designated and may hereafter be designated by Franchisor in writing for Franchisee's use in connection with the System (the "Proprietary Marks");

WHEREAS, Franchisee desires to enter into the business of operating a franchise under the System and using the Proprietary Marks, and wishes to enter into an agreement with Franchisor for that purpose, and to receive the training and other assistance provided by Franchisor in connection therewith; and

WHEREAS, Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, professionalism, appearances, and service and the necessity of operating the business franchised hereunder in conformity with Franchisor's standards and specifications;

NOW, THEREFORE, the parties agree as follows:

1.   GRANT

1.1    Franchisor grants to Franchisee the right and Franchisee undertakes the obligation, upon the terms and conditions set forth in this Agreement: (a) to establish and operate a franchised business under the System and using the Proprietary Marks (the "Franchised Business") and (b) to use the Proprietary Marks and the System solely in connection therewith.

**REDACTED**

1.2    Franchisee shall conduct the business operations of the Franchised Business only _____ Leesburg, VA  20175 (the "Approved Location"). Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose, or of its compliance with any applicable zoning or land-use regulations or ordinances and any federal, state and local laws, codes and regulations including, without limitation, the applicable provisions of the Americans with Disabilities Act (the "ADA") regarding the construction, design and operation of the Franchised Business if Franchisee operates the Franchised Business at an office location instead of at Franchisee's personal residence. Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for its purposes as of the time of the evaluation. Both Franchisee and Franchisor acknowledge that application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor shall not be responsible for the failure of a site approved by Franchisee to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that its acceptance of a franchise for the operation of the Franchised Business at the site is based on its own independent investigation of the suitability of the site. If, at the time of execution of this Agreement, a location for the Franchised Business has not been obtained by Franchisee and approved by Franchisor, Franchisee shall lease or acquire a location, subject to Franchisor's approval, as provided in the Site Selection Addendum attached hereto as Exhibit A. Franchisee shall not relocate the Franchised Business without the prior written approval of Franchisor.

1.3    Except as otherwise provided in this Agreement, during the term of this Agreement Franchisor shall not establish or operate, nor license any other person to establish or operate, a business under the System and using the Proprietary Marks serving any customer located within the following **Virginia – Counties of Loudoun, Clark and the Towns of Reston, VA and Herndon, VA** . (the "Protected Territory"). At any time after the one-year anniversary date of this Agreement, Franchisee may request that the Protected Territory be enlarged to include an additional geographic area. Franchisor, in its sole and absolute discretion, shall approve or disapprove Franchisee's request. If Franchisor approves Franchisee's request, Franchisor shall specify (1) a reasonable purchase price for the franchise rights to the additional area requested by Franchisee and (2) any additional terms or conditions as Franchisor may reasonably require.

1.3.1   During the term of this Agreement, Franchisor will not solicit or accept orders for Canada goose control services from customers located within the Protected Territory, except via Alternate Channels of Distribution, without Franchisee's prior approval.  If Franchisee grants approval for Franchisor to provide services to a customer within the Protected Territory, all moneys paid by the customer for the provision of those services will be paid to Franchisor.

1.4     Notwithstanding anything to the contrary hereto, if Franchisor determines that all or part of the Protected Territory is not being adequately serviced or otherwise could support an additional Geese Police franchise, then Franchisor will offer Franchisee a thirty (30) day right of first refusal to purchase and operate an additional Geese Police franchise within the Protected Territory.  The foregoing right of first refusal will not be afforded to Franchisee, and Franchisor may establish or grant rights to another person to establish a Geese Police franchise within the Protected Territory without any compensation or consideration of any kind to Franchisee if any one of the following conditions are satisfied:  (a) Franchisee is not in default under this Agreement as provided in Section 14 hereof and has not cured such default to the extent a cure period is provided in Section 14; (b) Franchisor determines, in its sole discretion, that Franchisee does not meet Franchisor's then current standards for new Geese Police franchisees; (c) Franchisor determines, in its sole discretion, that Franchisee lacks the financial resources to develop and operate an additional Geese Police franchise; (d) Franchisor fails to sign the then-current franchise agreement, within thirty days of the date Franchisor delivers a franchise agreement for signature; or (e) Franchisee notifies Franchisor that Franchisee does not wish to develop and operate an additional Geese Police franchise within the Protected Territory.

1.5     Franchisee acknowledges that the System may be supplemented, improved, and otherwise modified from time to time by Franchisor; and Franchisee agrees to comply with all reasonable requirements of Franchisor in that regard, including, without limitation, offering and selling new or different products or services as specified by Franchisor.

1.6     Prior to opening the Franchised Business, and after any renovation, as described in Section 2.2.2 below, if the Franchised Business is not located at Franchisee's personal residence, Franchisee shall execute and deliver to Franchisor an ADA Certification in the form attached to this Agreement as Exhibit B, to certify to Franchisor that the Franchised Business and any proposed renovations comply with the ADA.

1.7     Except as specifically granted herein, Franchisor retains all other rights related to the Franchised Business including but not limited to its rights to:  the Proprietary Marks, the other franchisees, and any other activities deemed appropriate by the Franchisor, including but not limited to:

1.7.1   the right to establish and operate, and to grant to others the right to establish and operate any other businesses offering similar or dissimilar products and services through similar or dissimilar channels of distribution, at any location inside or outside your Protected Territory under trademarks or service marks other that the Proprietary Marks, and on any terms and conditions Franchisor deems appropriate;

1.7.2   the right to provide, offer and sell and to grant others the right to provide, offer and sell goods and services that are identical or similar to and/or competitive with those

-3-

Case 3:18-cv-05122-FLW-TJB   Document 1-6   Filed 04/02/18   Page 8 of 51 PageID: 56

provided by Franchisor, whether identified by the Proprietary Marks or other trademarks or service marks, through Alternate Channels of Distribution (meaning any channel of distribution that is not a Franchised Business, including, by way of example only, sales of products or services via: the internet, catalogs or other mail order, telemarketing or other direct marketing);

      1.7.3   the right to establish and operate, and to grant to others the right to establish and operate, businesses offering dissimilar products and services, both inside and outside of the Protected Territory under any marks other than the Proprietary Marks and on any terms and conditions Franchisor deems appropriate;

      1.7.4   the right to operate, and to grant others the right to operate the Franchised Business anywhere outside of your Protected Territory under any terms and conditions Franchisor deems appropriate and regardless of proximity to the Approved Location;

      1.7.5   the right to acquire the assets or ownership interests of one or more businesses providing products and services similar to those provided by the Franchised Business, and franchising, licensing or creating similar arrangements with respect to these businesses once acquired, wherever theses businesses (or the franchisees or licensees of these businesses) are located or operating (including within your Protected Territory) under any mark other than the Proprietary Marks; and

      1.7.6   the right to be acquired (whether through acquisition of assets, ownership interests or otherwise, regardless of the form of transaction), by a business providing products and services similar to those provided by Franchisor, or by another business, even if such business operates, franchisees and/or licenses competitive business in your Protected Territory.

## 2.   TERM AND RENEWAL

      2.1   This Agreement shall be in effect upon its acceptance and execution by Franchisor and, except as otherwise provided herein, the term of this Agreement shall be five (5) years from the date first above written.

      2.2   Franchisee may, subject to the following conditions, renew this Agreement for two (2) additional consecutive terms of five (5) years each. The following conditions shall be met prior to each renewal:

      2.2.1   Franchisee shall give Franchisor written notice of Franchisee's election to renew not less than one (1) month nor more than three (3) months prior to the end of the then-current term;

      2.2.2   Franchisee shall make or provide for, in a manner satisfactory to Franchisor, (1) such renovation and modernization of the premises of the Franchised Business at the Approved Location as Franchisor may reasonably require, including, without limitation, installation of new dog housing, fencing, or other dog care or maintenance equipment or construction, installation of other equipment or materials, and renovation of signs, furnishings, fixtures, and decor to reflect the then-current standards and image of the System and (2) such refurbishment and/or repair of the vehicles used by the Franchised Business, as Franchisor may reasonably require;

2.2.3   Franchisee shall not be in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its affiliates; and Franchisee shall have substantially complied with all the terms and conditions of such agreements during the terms thereof;

2.2.4   Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

2.2.5   Franchisee shall present evidence satisfactory to Franchisor that Franchisee has the right to remain in possession of the Premises for the duration of the renewal term or shall obtain Franchisor's approval of a new location for the Franchised Business for the duration of the renewal term;

2.2.6   Franchisee shall, at Franchisor's option, execute Franchisor's then-current form of franchise agreement, which shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement, including, without limitation, a higher percentage royalty fee, except that Franchisee shall not be required to pay any initial franchise fee and the Protected Territory shall remain the same;

2.2.7   Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, and employees;

2.2.8   Franchisee shall comply with Franchisor's then-current qualification and training requirements; and

2.2.9   Franchisee shall reimburse Franchisor for any and all administrative costs incurred by Franchisor (including, without limitation, attorneys' fees) in connection with Franchisee's renewal, not to exceed fifty percent (50%) of the then-current initial franchise fee.

3.   <u>DUTIES OF FRANCHISOR</u>

3.1   Franchisor shall provide training as set forth in Section 5 of this Agreement.

3.2   Franchisor shall make available to Franchisee advertising and promotional materials as provided in Section 11.4 hereof.

3.3   Franchisor shall provide Franchisee, on loan, one (1) copy of Franchisor's Confidential Operating Manual (the "Manual"), as more fully described in Section 8 hereof.

3.4   Franchisor shall provide to Franchisee from time to time, as Franchisor deems appropriate, written advice and materials concerning techniques of managing and operating the Franchised Business, including, but not limited to, required and suggested sales and business development methods, and new developments in products, services, and marketing techniques through written, electronic, or telephone communications. In addition, Franchisor shall, at reasonable times and upon Franchisee's reasonable request, provide to Franchisee telephone advice relating to the operation of the Franchised Business.

3.5     Franchisor shall conduct, as it deems advisable, inspections of Franchisee's operation of the Franchised Business, and Franchisee's on-site provision of services to customers.

3.6     Franchisee acknowledges and agrees that any duty or obligation imposed on Franchisor by this Agreement may be performed by any designee, employee, or agent of Franchisor, as Franchisor may direct.

4.     FEES

4.1     In consideration of the franchise granted herein, Franchisee shall pay to Franchisor an initial franchise fee of Thirty-Five Thousand Dollars ($35,000), receipt of which is hereby acknowledged, which is fully earned and non-refundable in consideration of administrative and other expenses incurred by Franchisor in entering into this Agreement and for Franchisor's lost or deferred opportunity to enter into this Agreement with others; provided, however, that if Franchisee and/or Franchisee's manager fails to complete the initial training program described in Section 5.1 hereof to Franchisor's satisfaction, the initial franchise fee less Five Thousand Dollars ($5,000) shall be refunded to Franchisee upon termination of the Franchise Agreement by Franchisor pursuant to Section 14.2.1.

4.2     Franchisee shall purchase from Franchisor or a breeder specified by Franchisor, prior to attending Franchisor's initial training program under Section 5.1 hereof, the first two (2) trained Border Collies for use by the Franchised Business, for a total cost of between Ten Thousand Dollars ($10,000) and Fourteen Thousand Dollars ($14,000).

4.3     Franchisee shall pay to Franchisor a continuing monthly royalty fee in an amount equal to six percent (6%) of the Gross Sales of the Franchised Business.  Franchisee shall commence payment to Franchisor in such month of operation of the Franchised Business as Franchisor, in its sole discretion, designates in writing of such continuing monthly royalty fee. As used in this Agreement, "Gross Sales" means all revenue from the sale of all products and services and all other income of every kind and nature related to the Franchised Business (including, without limitation, any proceeds from business interruption insurance), whether for cash or credit, and regardless of collection in the case of credit.  Gross Sales shall not include any sales taxes or other taxes collected from customers by Franchisee and paid directly to the appropriate taxing authority.

4.4     All monthly payments required by this Section 4 shall be paid by the 10th day of each month, calculated on the Gross Sales for the preceding calendar month, and shall be submitted to Franchisor, together with any reports or statements required under Section 10.3 of this Agreement.  Any payment or report not actually received by Franchisor on or before such date shall be deemed overdue if not postmarked at least five (5) days prior thereto.  Franchisor has the right to require, in the Manual or otherwise in writing, that Franchisee make such payments and any other payments required under this Agreement (including any advertising fees described in Section 11 hereof) to Franchisor or to a bank account specified by Franchisor at the times and with the frequency designated by Franchisor, by electronic funds transfer, pre-authorized auto-draft arrangement, or such other means as Franchisor may specify from time to time.  Franchisee must furnish Franchisor, Franchisor's bank, and any other recipients of

payment, with such information and authorizations as may be necessary to permit such persons to make withdrawals by electronic funds transfer or auto-draft arrangement. Franchisee will bear all expenses, if any, associated with such authorizations and payments. If any payment or report is overdue, Franchisee shall pay Franchisor immediately upon demand, in addition to the overdue amount, interest on such amount from the date it was due until paid or until the report is submitted (as applicable), at the rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less. Entitlement to such interest shall be in addition to any other remedies Franchisor may have. Franchisee shall not be entitled to set-off any payments required to be made under this Section 4 against any monetary claim it may have against Franchisor.

5.  <u>TRAINING</u>

5.1   Prior to the opening of the Franchised Business, Franchisee (or, if Franchisee is a corporation, partnership, or limited liability company, a principal of Franchisee acceptable to Franchisor) or Franchisee's manager (if Franchisee or Franchisee's principal will not manage the Franchised Business) or both, at Franchisor's option, shall attend and complete to Franchisor's satisfaction the initial training program for franchisees offered by Franchisor. At Franchisor's option, any person subsequently employed by Franchisee as a manager or as a supervisor working with a dog to provide services to customers in the field shall also attend and complete Franchisor's initial training program, to Franchisor's satisfaction. Franchisee and Franchisee's manager and other employees shall also attend such additional training programs, courses, and seminars, as Franchisor may require from time to time.

5.2   Franchisor may require Franchisee and any employee of Franchisee that received training under Section 5.1 hereof to attend and complete to Franchisor's satisfaction a refresher training program, as determined by Franchisor, if Franchisor determines, as a result of an on-site inspection, that Franchisee's operation of the Franchised Business or provision of services to customers is deficient or not in compliance with the standards and specifications of the System.

5.3   All training programs shall be at such times and places as may be designated by Franchisor. Franchisor shall provide all required initial and additional training programs, courses, and seminars (as described in Section 5.1 hereof) at no charge to Franchisee. For all refresher training programs (as described in Section 5.2 hereof), Franchisee shall pay to Franchisor a tuition fee, as Franchisor may specify from time to time in the Manual or otherwise in writing. Franchisee or its employees shall be responsible for any and all other expenses incurred by them in connection with all required initial and additional training programs and any required refresher training programs, including, without limitation, the costs of transportation, lodging, meals, and wages.

6.  DUTIES OF FRANCHISEE

6.1   Franchisee shall obtain Franchisor's written approval prior to opening the Franchised Business, which approval shall not be unreasonably withheld, and shall open the Franchised Business within one hundred eighty (180) days after the date of this Agreement. The parties agree that time is of the essence in the opening of the Franchised Business.

6.2   Franchisee understands and acknowledges that every detail of the Franchised Business is important to Franchisee, Franchisor, and other franchisees in order to develop and maintain high operating standards, to increase the demand for the services provided by all franchised businesses operating under the System, and to protect Franchisor's reputation and goodwill.

6.3   Franchisee shall keep the Franchised Business open and in normal operation for such minimum hours and days as Franchisor may specify.

6.4   To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Franchised Business in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual or otherwise in writing.  Franchisee shall refrain from deviating from such methods, standards, and specifications without Franchisor's prior written consent.  Franchisee agrees:

6.4.1   To use at all times only such working Border Collies or other dogs as conform with Franchisor's standards and specifications, and to refrain from deviating therefrom by the use of dogs which do not conform to such standards, without Franchisor's prior written consent.  If Franchisee wishes to purchase additional dogs for the Franchised Business beyond the first two (2) dogs, Franchisee shall request, in writing, Franchisor's prior written approval of such additional dogs, which approval shall be granted at Franchisor's sole discretion.  In connection with Franchisor's examination and review of such additional dogs, Franchisee shall pay to Franchisor, upon Franchisor's request, a fee of Two Hundred Fifty Dollars ($250) for each dog Franchisee seeks to have approved.  In addition, Franchisee shall reimburse Franchisor, upon Franchisor's request, for any and all expenses (including, without limitation, travel and lodging expenses) incurred by Franchisor or its designated agents in connection with Franchisor's examination and review of such additional dogs; provided, however, that Franchisee shall not be responsible for the wages of Franchisor's designated agents during such examination and review.

6.4.2   To maintain in sufficient supply (as Franchisor may prescribe in the Manual or otherwise in writing), and to use at all times, only such employee uniforms, fixtures, furnishings, equipment, products, materials, and supplies as conform with Franchisor's standards and specifications, and to refrain from deviating therefrom by the use of nonconforming items, without Franchisor's prior written consent.

6.4.3   To sell or offer for sale only such products and services as have been expressly approved for sale in writing by Franchisor; to sell or offer for sale all types of products and services specified by Franchisor; to refrain from any deviation from Franchisor's standards and specifications without Franchisor's prior written consent; and to discontinue selling and offering for sale any products or services which Franchisor may, in its discretion, disapprove in writing at any time.

6.4.4   To purchase and install, at Franchisee's expense, all equipment (including, without limitation, a fax machine, telephone, and computer hardware and software systems) and signs as Franchisor may reasonably direct from time to time; and to refrain from installing or permitting to be installed on or about the Premises of the Franchised Business, without

Franchisor's prior written consent, any equipment and signs (including, without limitation, automobile signage), or other items not previously approved as meeting Franchisor's standards and specifications.

6.5     All products used in the operation of the Franchised Business shall meet Franchisor's then-current standards and specifications, as established in the Manual or otherwise in writing. Franchisee shall purchase all products solely from suppliers who have been approved by Franchisor in the Manual or otherwise in writing.  Franchisor may from time to time revoke its approval of particular products or suppliers when Franchisor determines, in its reasonable discretion, that such products or suppliers no longer meet Franchisor's standards.  Upon receipt of written notice of such revocation, Franchisee shall cease to use any disapproved products and cease to purchase from any disapproved supplier.  Franchisee agrees that it shall use products purchased from suppliers solely for the purpose of operating the Franchised Business and not for any other purpose, including, without limitation, resale.

6.6     Franchisee shall permit Franchisor and its agents to enter upon the Premises of the Franchised Business at any time during normal business hours, and to accompany Franchisee during Franchisee's on-site provision of services to customers, for the purpose of conducting inspections; shall cooperate with representatives of Franchisor in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents, and without limiting Franchisor's other rights under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. The foregoing shall be in addition to such other remedies Franchisor may have.

6.7     Franchisee shall make arrangements for Franchisor to accompany Franchisee or its employees at any customer presentation and/or during Franchisee's or its employees' provision of services to customers, at such times as may be reasonably requested by Franchisor, from time to time.

6.8     Franchisee shall ensure that all advertising, marketing and promotional materials, signs, decorations, and other items specified by Franchisor bear the Proprietary Marks in the form, color, location, and manner prescribed by Franchisor.  Franchisee shall further ensure that its employees, while performing their duties as employees of the Franchised Business, are dressed in the authorized uniform prescribed by Franchisor in the Manual or otherwise in writing.

6.9     The Franchised Business shall at all times be under the direct, on-premises supervision of an individual who has satisfactorily completed Franchisor's training program. Franchisee shall maintain a competent, conscientious, trained staff.  Franchisee shall take such steps as are necessary to ensure that its employees preserve good customer relations; render competent, prompt, courteous, and knowledgeable service; and meet such minimum standards as Franchisor may establish from time to time in the Manual or otherwise in writing.  Franchisee and its employees shall handle all customer complaints, refunds, returns, and other adjustments in a manner that will not detract from the name and goodwill of Franchisor.  Franchisee shall be solely responsible for all employment decisions and functions of the Franchised Business, including, without limitation, those related to hiring, firing, training, wage and hour requirements, record-keeping, supervision, and discipline of employees.

6.10     Franchisee shall not implement any change, amendment, or improvement to the System without the express prior written consent of Franchisor. Franchisee shall notify Franchisor in writing of any change, amendment, or improvement in the System which Franchisee proposes to make, and shall provide to Franchisor such information as Franchisor requests regarding the proposed change, amendment, or improvement. Franchisee acknowledges and agrees that Franchisor shall have the right to incorporate the proposed change, amendment, or improvement into the System and shall thereupon obtain all right, title, and interest therein without compensation to Franchisee.

6.11     Franchisee acknowledges and agrees that it may not advertise or solicit the offer or sale of products or services hereunder outside the Protected Territory without Franchisor's prior written approval; provided, however, that Franchisee shall not be restricted from placing advertising, in a form approved by Franchisor, in print or other media, or from placing listings in one or more "yellow pages," which circulate in Franchisee's Protected Territory.  Franchisee further acknowledges and agrees that it will not:  (a) accept orders from outside the Protected Territory unless there is no business operating under the System in the zip code zone from which the order originates and Franchisee has obtained approval from Franchisor to accept such order; or (b) solicit the sale of products or services through Alternate Channels of Distribution.  In the event Franchisee has obtained approved from Franchisor to accept one or more orders from outside the Protected Territory and Franchisor subsequently establishes a franchisee in the zip code zone(s) from which such order(s) originates, Franchisee shall be obligated to assign such order(s) to the new franchisee so established by Franchisor.

6.12     Franchisee acknowledges and agrees that, notwithstanding the efforts of Franchisee in marketing to obtain customers and in compiling a list of the names and address of the customers and the potential customers of the Franchised Business in the Protected Territory (the "Customer List"), in consideration of the grant of rights to operate a Franchised Business in the Protected Territory and the training provided by Franchisor in the methods of obtaining customers for the Franchised Business, the Customer List shall at all times belong to, and all ownership rights therein shall be held by, Franchisor; provided, however, that, at all times when this Agreement is in effect, Franchisee shall have a license to use the Customer List in the operation of the Franchised Business.

6.13     Franchisee shall conduct the Franchised Business in compliance with all applicable laws including, without limitation, all laws pertaining to the operation of motor vehicles and insurance coverage relating to the operation of motor vehicles.

7.     PROPRIETARY MARKS

7.1     Franchisor represents with respect to the Proprietary Marks that Franchisor has the right to use, and to license others to use, the Proprietary Marks.

7.2     With respect to Franchisee's use of the Proprietary Marks, Franchisee agrees that:

7.2.1     Franchisee shall use only the Proprietary Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor;

7.2.2    Franchisee shall use the Proprietary Marks only for the operation of the Franchised Business and only at the Approved Location, or in advertising for the Franchised Business conducted at or from the Approved location;

7.2.3    Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Franchised Business only under the name "Geese Police", and shall use all Proprietary Marks without prefix or suffix;

7.2.4    Franchisee shall identify itself as the owner of the Franchised Business (in the manner required by Franchisor) in conjunction with any use of the Proprietary Marks, including, but not limited to, on invoices, receipts, and business stationery, as well as at such conspicuous locations as Franchisor may designate in writing at the Premises of the Franchised Business and on any vehicles used in the operation of the Franchised Business;

7.2.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of rights of Franchisor;

7.2.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor or its affiliates;

7.2.7    Franchisee shall execute any documents deemed necessary by Franchisor to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability; and

7.2.8    Franchisee shall promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks. Franchisee acknowledges that, as between Franchisor and Franchisee, Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof. Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks. Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Marks. If Franchisor, in its sole discretion, determines that Franchisee has used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisor. If Franchisor, in its sole discretion, determines that Franchisee has not used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisee. In the event of any litigation relating to Franchisee's use of the Proprietary Marks, Franchisee shall execute any and all documents and do such acts as may, in the opinion of Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action. Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for its out-of-pocket costs in doing such acts.

7.3    Franchisee expressly understands and acknowledges that:

7.3.1    Franchisor is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

7.3.2    The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

7.3.3    During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, or Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks;

7.3.4    Franchisee's use of the Proprietary Marks does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks;

7.3.5    Any and all goodwill arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of Franchisor, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks;

7.3.6    Except as specified in Section 1.3 hereof, the license of the Proprietary Marks granted hereunder to Franchisee is nonexclusive, and Franchisor thus has and retains the rights, among others:  (a) to use the Proprietary Marks itself in connection with selling products and services; (b) to grant other licenses for the Proprietary Marks; and (c) to develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

7.3.7    Franchisor and its affiliates have the right, in their sole discretion, but not the obligation, to substitute different proprietary marks for use in identifying the System and the businesses operating thereunder.  Franchisor shall bear the costs of modifying Franchisee's signs and advertising materials to conform to Franchisor's new Proprietary Marks, but shall otherwise have no obligation or liability to Franchisee as a result of such substitution.

8.    OPERATING MANUAL

8.1    Franchisor shall provide Franchisee, on loan for the remaining term of this Agreement, one (1) copy of the Manual.  In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under the System, Franchisee shall operate the Franchised Business in accordance with the standards, methods, policies, and procedures specified in the Manual.

8.2    Franchisee shall treat the Manual, any other manuals created for or approved for use in the operation of the Franchised Business, and the information contained therein, as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential.  Franchisee shall not copy, duplicate, record, or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

8.3     The Manual shall remain the sole property of Franchisor and shall be kept in a secure place on the Premises of the Franchised Business.

8.4     Franchisor may from time to time revise the contents of the Manual, and Franchisee expressly agrees to comply with each new or changed standard.  Franchisor shall deliver copies of the revisions to Franchisee and Franchisee shall be obligated to comply with each new or changed standard immediately upon receipt of such revisions.

8.5     Franchisee shall ensure that the Manual is kept current at all times.  In the event of any dispute as to the contents of the Manual, the terms of the master copy maintained by Franchisor at Franchisor's home office shall be controlling.

9.     <u>CONFIDENTIAL INFORMATION</u>

9.1     Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge, or use for the benefit of any other person, partnership, association, limited liability company, or corporation any confidential information, knowledge, or know-how concerning the methods of operation of the business franchised hereunder which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement. Franchisee shall divulge such confidential information only to such of its employees as must have access to it in order to operate the Franchised Business.  Any and all information, knowledge, know-how, techniques, and other data which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement.

9.2     At Franchisor's request, Franchisee shall require any personnel having access to any confidential information of Franchisor to execute covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Franchised Business.  Such covenants shall be in a form satisfactory to Franchisor, including, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with the independent right to enforce them.

10.     <u>ACCOUNTING AND RECORDS</u>

10.1     Franchisee shall prepare, and shall preserve for at least three (3) years from the dates of their preparation, complete and accurate books, records, and accounts in accordance with generally accepted accounting principles, and in the form and manner prescribed by Franchisor from time to time in the Manual or otherwise in writing.

10.2     All Gross Sales, sales tax, and charges collected on behalf of third parties shall be recorded by Franchisee in a clear, consistent, and organized manner, and as may be prescribed by Franchisor from time to time in the Manual or otherwise in writing.

10.3     Franchisee shall, at Franchisee's expense, submit to Franchisor in the form prescribed by Franchisor, the following reports, financial statements, and other data:

10.3.1 No later than the tenth (10th) day of each month, a report accurately reflecting all Gross Sales during the preceding calendar month;

-13-

10.3.2  Within ninety (90) days after the end of each fiscal year of the Franchised Business, unaudited financial statements showing the results of operations of the Franchised Business during said fiscal year; and

10.3.3  Such other forms, reports, records, information, and data as Franchisor may reasonably designate.

10.4    Franchisor and its designated agents shall have the right at all reasonable times to examine and copy, at Franchisor's expense, the books, records, accounts, and tax returns of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of the books of Franchisee. If an inspection or audit should reveal that any payments have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less. If an inspection or audit discloses an understatement in any report of two percent (2%) or more, Franchisee shall, in addition to repayment of monies owed with interest, reimburse Franchisor for any and all costs and expenses in connection with the inspection or audit (including, without limitation, travel, lodging and wages expenses, and reasonable accounting and legal costs). The foregoing remedies shall be in addition to any other remedies Franchisor may have.

11.    ADVERTISING, MARKETING AND PROMOTION

Recognizing the value of advertising, marketing and promotion, and the importance of the standardization of advertising, marketing and promotion programs to the furtherance of the goodwill and public image of the System, the parties agree as follows:

11.1    Each month during the term of this Agreement, Franchisee shall contribute for advertising, marketing and promotion two percent (2%) of Franchisee's Gross Sales for the preceding month to the System's advertising and marketing fund (the "Fund"), if a Fund is established pursuant to Section 11.2 hereof.

11.2    Franchisor shall have the right, in its sole discretion, but not the obligation, to establish the Fund. If established, the Fund shall be maintained and administered by Franchisor as follows:

11.2.1  Franchisor shall direct all advertising and marketing programs, with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that the Fund is intended to maximize general public recognition, acceptance, and use of the System; and that Franchisor is not obligated, in administering the Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or from expenditures by the Fund.

11.2.2  The Fund, all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all costs of maintaining, administering, directing, conducting, and preparing advertising, marketing, public relations, and/or promotional programs and materials, and any other activities which Franchisor believes will enhance the image of the

System, including, among other things, the costs of preparing and conducting media advertising campaigns; direct mail advertising; marketing surveys; employing advertising and/or public relations agencies to assist therein; purchasing promotional items; 1-800 number operations; and providing promotional and other marketing materials and services to the businesses operating under the System.

11.2.3  Franchisee shall contribute to the Fund by separate checks made payable to the Fund.  All sums paid by Franchisee to the Fund shall be maintained in an account separate from the other monies of Franchisor and shall not be used to defray any of Franchisor's expenses, except for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Fund and advertising programs for franchisees and the System, including, among other things, costs of personnel for creating and implementing advertising, promotional, and marketing programs.  The Fund and any earnings thereon shall not otherwise inure to the benefit of Franchisor.  Franchisor shall maintain separate bookkeeping accounts for the Fund.  Franchisee acknowledges Franchisor is not a fiduciary to Franchisee of the monies in the Fund.

11.3     All advertising, marketing and promotion by Franchisee shall be in such media, including, but not limited to the Internet (subject to Section 11.7.1), and of such type and format as Franchisor may approve, shall be conducted in a dignified manner, and shall conform to such standards and requirements as Franchisor may specify.  Franchisee shall not use any advertising or promotional plans or materials unless and until Franchisee has received written approval from Franchisor, pursuant to the procedures and terms set forth in Section 11.5 hereof.

11.4     Franchisor shall make available to Franchisee from time to time, at Franchisee's expense, such advertising and marketing plans and promotional materials (including sales aids, special promotions, and similar advertising and promotional materials) as Franchisor deems advisable, in Franchisor's sole and absolute discretion.

11.5     Franchisee shall submit samples of all advertising, marketing and promotional plans and materials to Franchisor (as provided in Section 21 hereof), for Franchisor's prior approval (except with respect to prices to be charged) if such plans and materials have not been prepared or previously approved by Franchisor within the prior six-month period.  Franchisee shall not use such plans or materials until they have been approved in writing by Franchisor.  If written notice of disapproval is not received by Franchisee from Franchisor within thirty (30) days of the date of receipt by Franchisor of such samples or materials, Franchisor shall be deemed to have approved them.

11.6     Franchisee shall, at its expense, obtain listings in the white and yellow pages of local telephone directories.  Franchisee shall comply with Franchisor's specifications concerning the form and size of such listings, and the number of directories in which such listings shall be placed.

11.7     Franchisee specifically acknowledges and agrees that any Web Site (as defined below) will be deemed "advertising" under this Agreement, and will be subject to (among other things) Franchisor's approval under Section 11.5 above.  As used in this Agreement, the term "Web Site" means an interactive electronic document, series of symbols, or otherwise, that is

contained in a network of computers and/or other devices linked by communications software. The term Web Site includes, but is not limited to, the Internet and World Wide Web.

11.7.1 Franchisor will have the right, but not the obligation, to establish and maintain a Web Site (which may, without limitation, promote the Marks and/or the System, or serve as an intranet, extranet, or other means of electronic communication within the System). Franchisor will have the sole right to control all aspects of the Web Site, including without limitation its design, content, functionality, links to other websites, legal notices, and policies and terms of usage. Franchisor will also have the right to discontinue operation of the Web Site at any time without notice to Franchisee.

11.7.2 Except as approved in advance in writing by Franchisor, Franchisee must not establish or maintain a separate Web Site, or otherwise maintain a presence or advertise on the Internet or any other public computer network in connection with the Franchised Business. If such written approval is granted by Franchisor, Franchisee must establish and operate such Web Site in accordance with Franchisor's standards and policies provided to Franchisee in the Manual or otherwise in writing from time to time. In the event Franchisor establishes a Web Site, Franchisee shall establish a separate page on such Web Site and otherwise participate with Franchisor and the other franchisees of Franchisor in utilizing such Web Site in order to maximize the benefits of such Web Site for all franchisees of Franchisor.

11.7.3 Franchisor will have the right to modify the provisions of this Section 11.7 relating to Web Sites in the Manual, as Franchisor solely determines is necessary or appropriate for the best interests of the System.

12.   INSURANCE

12.1   Franchisee shall procure, prior to the commencement of any operations under this Agreement, and shall maintain in full force and effect at all times during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee, Franchisor, and their respective officers, directors, partners, agents, and employees against any demand or claim with respect to personal injury, death, or property damage, or any loss, liability, or expense whatsoever arising or occurring upon or in connection with the Franchised Business, including, but not limited to, comprehensive general liability insurance, property and casualty insurance, statutory workers' compensation insurance, employer's liability insurance, product liability insurance, professional liability insurance, and automobile insurance coverage for all vehicles used in the Franchised Business. Such policy or policies shall be written by a responsible carrier or carriers acceptable to Franchisor, shall name Franchisor as an additional insured as specified by Franchisor, and shall provide at least the types and minimum amounts of coverage specified by Franchisor in writing.

12.2   Franchisee's obligation to obtain and maintain the policy or policies in the amounts specified by Franchisor shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 19.3 of this Agreement.

12.3    Prior to the commencement of any operations under this Agreement, and thereafter at least thirty (30) days prior to the expiration of any policy, Franchisee shall deliver to Franchisor Certificates of Insurance evidencing the proper types and minimum amounts of coverage. All Certificates shall expressly provide that no less than thirty (30) days prior written notice shall be given Franchisor in the event of material alteration to or cancellation of the coverages evidenced by such Certificates.

12.4    Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in writing, Franchisor shall have the right and authority (but not the obligation) to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

13.    <u>TRANSFER OF INTEREST</u>

13.1    Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity, and any designated assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment. Franchisee shall execute such documents of attornment or otherwise as Franchisor shall request.

13.2    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on Franchisee's (or, if Franchisee is a corporation, partnership, or limited liability company, its principals') business skill, financial capacity, and personal character. Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this Agreement, nor any individual, corporation, partnership, limited liability company, or other legal entity which directly or indirectly owns any interest in Franchisee or in the Franchised Business, shall sell, assign, transfer, convey, pledge, encumber, merge, or give away (collectively, "transfer") any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business without the prior written consent of Franchisor. Any purported assignment or transfer not having the written consent of Franchisor required by this Section 13.2 shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may immediately terminate without opportunity to cure pursuant to Section 14.2.5 of this Agreement.

13.3    Franchisee shall notify Franchisor in writing of any proposed transfer of any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business at least thirty (30) days before such transfer is proposed to take place. Franchisor shall not unreasonably withhold its consent to any transfer; provided, however, that Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

13.3.1    That all of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor and its affiliates have been satisfied;

-17-

13.3.2  That Franchisee is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its affiliates;

13.3.3  That the transferor shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its officers, directors, agents, shareholders, and employees;

13.3.4  That the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement; and, if the obligations of Franchisee were guaranteed by the transferor, that the transferee guarantee the performance of all such obligations in writing in a form satisfactory to Franchisor;

13.3.5  That the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) demonstrate to Franchisor's satisfaction that it meets Franchisor's educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to operate the Franchised Business (as may be evidenced by prior related business experience or otherwise), and has adequate financial resources and capital to operate the Franchised Business;

13.3.6  That the transferee execute, for a term ending on the expiration date of this Agreement and with such renewal term(s) as may be provided by this Agreement, the then-current form of franchise agreement and other ancillary agreements as Franchisor may require for the Franchised Business, which agreements shall supersede this Agreement in all respects except that the transferee shall not be required to pay any initial franchise fee, and the royalties payable to Franchisor hereunder and the Protected Territory shall remain the same;

13.3.7  That Franchisee remain liable for all of the obligations to Franchisor in connection with the Franchised Business which arose prior to the effective date of the transfer and execute any and all instruments reasonably requested by Franchisor to evidence such liability;

13.3.8  That the transferee (or, if the transferee is a corporation, partnership or limited liability company, a principal of the transferee acceptable to Franchisor), and the transferee's manager (if transferee or transferee's principal will not manage the Franchised Business), at the transferee's expense, complete any training programs then in effect upon such terms and conditions as Franchisor may reasonably require. In connection with such training, transferee shall pay to Franchisor a training fee in an amount equal to fifteen percent (15%) of the initial franchise fee being charged to new System franchisees at the time of the transfer, but not less than Three Thousand Dollars ($3,000).

13.3.9  That Franchisee pay a transfer fee in an amount equal to two thirds (2/3) of the then current initial franchise fee being charged to new System franchisees at the time of

the transfer.  However, in the case of a transfer to a corporation formed by Franchisee for the convenience of ownership, no such transfer fee shall be required.

13.4    Franchisee shall not grant a security interest in the Franchised Business or in any of the assets of the Franchised Business unless the secured party agrees that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Franchisee, and, in the event Franchisor exercises such option, any acceleration of indebtedness due to Franchisee's default shall be void.

13.5    If any party holding any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business desires to accept any bona fide offer from a third party to purchase such interest or assets, Franchisee shall notify Franchisor as provided in Section 13.3 hereof, and shall provide such information and documentation relating to the offer as Franchisor may require.  Franchisor shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  If Franchisor elects to purchase the seller's interest, closing on such purchase shall occur at the later of the closing date set forth in the offer or within sixty (60) days from the date of notice to the seller of the election to purchase by Franchisor.  If Franchisor elects not to purchase the seller's interest or Franchisee's assets, any material change thereafter in the terms of the offer from a third party shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer.  In the event that Franchisor fails to exercise the right of first refusal, Franchisee shall then be entitled to dispose of all or a part of such assets, or the shareholders/partners/members or owners shall be entitled to dispose of such interests or assets, as the case may be, on the terms and conditions set forth in the offer within a period of ninety (90) days following the end of the aforesaid thirty (30) day period upon compliance with the provisions of Section 13.6 below.  If such transfer is not consummated within such ninety (90) day period, such interests or assets shall once again become subject to the restrictions imposed by this Agreement.  Failure of Franchisor to exercise the option afforded by this Section 13.5 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 13, with respect to a proposed transfer. In the event the consideration, terms, and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms, and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash.  If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms, and/or conditions offered by the third party, an independent appraiser shall be designated by Franchisor at Franchisor's expense, and the appraiser's determination shall be binding.

13.6    In the event that Franchisor fails to exercise the right of first refusal and Franchisee seeks to dispose of all or substantially all of its assets or any party seeks to dispose of all or part of their interests in Franchisee on the terms and conditions set forth in the offer, and the proposed transferee intends to continue the business operated by Franchisee or to operate a business of the type described in Section 16.3, such right to disposition shall be expressly conditioned upon and may not be exercised without Franchisee first having performed each of the following obligations:  (i) Franchisee shall have secured from Franchisor the approval of the

-19-

acquiring person or entity as having met the then-existing qualifications for a franchisee of Franchisor; (ii) Franchisee shall have paid all royalty fees, contributions to the Fund and other invoices then due but unpaid to Franchisor; (iii) Franchisee shall have paid a transfer fee to Franchisor of: (A) not more than Ten Thousand Dollars ($10,000) in the case of a transfer to an existing franchisee of Franchisor; or (B) not more than two-thirds (2/3) of the then-current franchise fee in the case of a transferee who is not a franchisee of Franchisor, in each case for the costs of handling the transfer documentation and, in the case of a non-franchisee transferee, for the costs of qualifying and approving such transferee and providing training to such transferee; (iv) Franchisee shall have secured from the acquiring person or entity an unconditional commitment, in writing, that: (A) the Franchised Business being acquired will continue to operate under the Proprietary Marks and using the System; (B) the acquiring person or an officer of the acquiring entity shall visit Franchisor's corporate headquarters for an orientation meeting; (C) the acquiring person or entity shall execute a Franchise Agreement with Franchisor containing terms and conditions substantially similar to this Franchise Agreement; provided, however, no initial franchise fee shall be due and payable pursuant to Section 4.1 of such Franchise Agreement; but the rate of the royalty fee set forth in Section 4.3 shall become the then-current rate being charged to new franchisees of Franchisor; (D) the Protected Territory for the acquiring person or entity shall be determined by Franchisor using the standards customarily used by Franchisor in determining the area of responsibility for a new franchisee of the right to use the Proprietary Marks and System; and (E) the acquiring person or entity shall cause the intended Managers of the Franchised Business to attend and successfully complete the Franchisor's training program described in Section 5 hereof prior to the change of management control over the Franchised Business; and (v) Franchisee shall have executed and delivered to Franchisor a termination agreement and general release of all claims against Franchisor with respect to this Agreement.

13.7    Upon the death or mental incapacity of any person with an interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business, the executor, administrator, or personal representative of such person shall transfer such interest to a third party approved by Franchisor within six (6) months after such death or mental incapacity. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer. In the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Section 13, the executor, administrator, or personal representative of the decedent shall transfer the decedent's interest to another party approved by Franchisor within a reasonable time, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement. If the interest is not disposed of within a reasonable time, Franchisor may terminate this Agreement, pursuant to Section 14.2.6 hereof.

13.8    Franchisor's consent to a transfer of any interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

-20-

14.    DEFAULT AND TERMINATION

14.1    Franchisee shall be deemed to be in default under this Agreement, and all rights granted to Franchisee herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or such a petition is filed against and not opposed by Franchisee; if Franchisee is adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); if Franchisee is dissolved; if execution is levied against Franchisee's business or property; if suit to foreclose any lien or mortgage against the premises of the Franchised Business or equipment is instituted against Franchisee and not dismissed within thirty (30) days; or if the real or personal property of the Franchised Business shall be sold after levy thereupon by any sheriff, marshal, or constable.

14.2    Upon the occurrence of any of the following events of default, Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee (in the manner provided under Section 21 hereof):

14.2.1  If Franchisee fails to commence operation of the Franchised Business within one hundred eighty (180) days after the date first above written; or if Franchisee and/or Franchisee's manager fail to complete the initial training program described in Section 5.1 hereof to Franchisor's satisfaction within one hundred twenty (120) days from the date first above written;

14.2.2  If Franchisee at any time ceases to operate or otherwise abandons the Franchised Business, or loses the right to possession of the Premises of the Franchised Business, or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchised Business is located for more than five (5) consecutive business days.  However, if, through no fault of Franchisee, the Premises of the Franchised Business are damaged or destroyed by an event such that repairs or reconstruction cannot be completed within sixty (60) days thereafter, then Franchisee shall have thirty (30) days after such event in which to apply for Franchisor's approval to relocate and/or reconstruct the Premises of the Franchised Business, which approval shall not be unreasonably withheld;

14.2.3  If Franchisee is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith, or Franchisor's interest therein;

14.2.4  If a threat or danger to public health or safety results from the operation of the Franchised Business;

-21-

14.2.5  If any purported assignment or transfer of any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business is made to any third party without Franchisor's prior written consent, contrary to the terms of Section 13 hereof;

14.2.6  If an approved transfer is not effected within the time provided following death or mental incapacity, as required by Section 13.6 hereof;

14.2.7  If Franchisee fails to comply with the covenants in Section 16.2 hereof or fails to obtain execution of the covenants required under Sections 9.2 or 16.7 hereof;

14.2.8  If, contrary to the terms of Sections 8 or 9 hereof, Franchisee discloses or divulges the contents of the Manual or other confidential information provided to Franchisee by Franchisor;

14.2.9  If Franchisee knowingly maintains false books or records, or submits any false reports to Franchisor;

14.2.10    If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the System, or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein;

14.2.11    If Franchisee refuses to permit Franchisor to inspect the Premises of Franchised Business, or the books, records, or accounts of Franchisee upon demand;

14.2.12    If Franchisee fails to procure and maintain insurance in accordance with Section 12 hereof;

14.2.13    If Franchisee, upon receiving a notice of default under Section 14.3 hereof, fails to initiate immediately a remedy to cure such default; or

14.2.14    If Franchisee, after curing any default pursuant to Section 14.3 hereof, commits the same or a different default three (3) times within any twelve-month period, whether or not such defaults are cured after notice.

14.3    Except as otherwise provided in Sections 14.1 and 14.2 of this Agreement, upon any other default by Franchisee, Franchisor may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 21 hereof) stating the nature of the default to Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor within the thirty-day period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require. Defaults which are susceptible of cure hereunder include the following illustrative events:

14.3.1  If Franchisee fails to substantially comply with any of the requirements imposed by this Agreement, as it may from time to time reasonably be supplemented by the Manual or otherwise in writing by Franchisor, or failure to carry out the terms of this Agreement in good faith;

14.3.2  If Franchisee fails, refuses, or neglects promptly to pay any monies owing to Franchisor or its affiliates when due, or to submit the financial or other information required by Franchisor under this Agreement;

14.3.3  If Franchisee fails to maintain or observe any of the standards or procedures prescribed by Franchisor in this Agreement, the Manual, or otherwise in writing;

14.3.4  Except as provided in Section 14.2.5 hereof, if Franchisee fails, refuses, or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement;

14.3.5  If Franchisee engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks;

14.3.6  If Franchisee fails to comply with all applicable laws, rules and regulations related to the operation of the Franchised Business (including, without limitation, the applicable provisions of the ADA regarding the construction, design and operation of the Franchised Business if the Franchised Business is not located at Franchisee's personal residence);

14.3.7  If Franchisee fails to commence operations of the Franchised Business in accordance with Section 6.1 hereof;

14.3.8  If Franchisee or Franchisor receives more than five (5) customer complaints in any twelve-month period; or

14.3.9  If any guarantor of this Agreement shall default under its obligations.

15.     OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

15.1    Franchisee shall immediately cease to operate the Franchised Business, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

15.2    Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System; and the Proprietary Mark "Geese Police" and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System. In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks.

-23-

15.3    Franchisee shall take such action as may be necessary to cancel any assumed name registration or equivalent registration obtained by Franchisee which contains the mark "Geese Police" or any other Proprietary Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

15.4    Franchisee shall make such modifications or alterations to the Premises of the Franchised Business (including, without limitation, the changing of, and the assigning to Franchisor of, the telephone number) and to any vehicles used in connection with the Franchised Business immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises and any such vehicles of the Franchised Business from that of the premises and the vehicles of a franchised business under the System, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this Section 15.4, Franchisor shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes to the Premises and to any vehicles as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

15.5    Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in Franchisor's sole discretion, is likely to cause confusion, mistake, or deception, or which, in Franchisor's sole discretion, is likely to dilute Franchisor's rights in and to the Proprietary Marks.  Franchisee further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to the Franchisor, the System, or the Proprietary Marks) which, in Franchisor's sole discretion, suggests or represents a present or former association or connection with Franchisor, the System, or the Proprietary Marks.

15.6    Franchisee shall promptly pay all sums owing to Franchisor and its affiliates. In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid-in-full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee and used in the operation of the Franchised Business.

15.7    Franchisee shall immediately deliver to Franchisor the Customer List relating to the Franchised Business, which are acknowledged to be the property of Franchisor, and shall retain no copy or record of any such customer lists.  At the option of Franchisor, Franchisee shall assign to Franchisor all of the contracts with customers of the Franchised Business.  In addition, Franchisee shall immediately deliver to Franchisor the Manual and all other records, correspondence, and instructions containing confidential information relating to the operation of the Franchised Business (and any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor, and shall retain no copy or record of any of the foregoing, with the exception of Franchisee's copy of this Agreement, any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

-24-

15.8    Franchisor shall have the option, to be exercised within thirty (30) days after termination, to purchase from Franchisee (1) any or all of the dogs and vehicles used by the Franchised Business and any or all of the equipment and signs related to the operation of the Franchised Business, at fair market value or at Franchisee's depreciated book value, whichever is less and (2) any or all supplies and inventory of the Franchised Business, at Franchisee's cost or depreciated book value, whichever is less.  If the parties cannot agree on the price of any such items within a reasonable time, an independent appraisal shall be conducted at Franchisor's expense, and the appraiser's determination shall be binding.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee, and the cost of the appraisal, if any, against any payment therefor.

15.9    Franchisee shall comply with the covenants contained in Section 16.3 of this Agreement.

15.10    Upon termination of this Agreement:  (i) by Franchisor following Franchisee's default; or (ii) by Franchisee prior to the end of its term without Franchisor's consent, Franchisee agrees to pay to Franchisor within fifteen (15) days after the effective date of this Agreement's termination, in addition to the amounts owed hereunder, liquidated damages equal to the present value (using the then-current 30-Year Treasury Bond rate) of the royalty fees Franchisee would have paid, calculated as the product of:

a.    The Franchised Business' average monthly Gross Sales during its most recent twelve (12) months of operation before the termination (annualized if this Agreement has been in effect less than twelve (12) months at such time), multiplied by the lesser of the number of months remaining in this Agreement had it not been terminated, or thirty-six (36); and

b.    the six percent (6%) royalty rate.

The parties hereto acknowledge and agree that it would be impracticable to determine precisely the damages Franchisor would incur as a result of termination of this Agreement and the loss of cash flow from royalty fees due to, among other things, the complications of determining what costs, if any, Franchisor might have saved and how much the royalty fees would have grown over what would have been this Agreement's remaining term.  The parties hereto consider this liquidated damages provision to be a reasonable, good faith pre-estimate of those damages and the parties acknowledge and agree that such amount does not constitute a penalty.

16.    COVENANTS NOT TO COMPETE

16.1    Franchisee covenants that, during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, a principal, general partner or member of Franchisee) or Franchisee's fully-trained manager shall devote full time and best efforts to the management and operation of the Franchised Business.

16.2    Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable, specialized training and confidential information, including, without limitation, information regarding the operational, sales, and promotional methods and

techniques of Franchisor and the System. Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity:

      16.2.1   Divert or attempt to divert any present or prospective business or customer of Franchisor or any other business operating under the System to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System;

      16.2.2   Employ or seek to employ any person who is at that time employed by Franchisor or by any other business operating under the System, or otherwise directly or indirectly induce such person to leave his or her employment; or

      16.2.3   Own, maintain, operate, engage in, be employed by, provide any assistance to, or have any interest in (as owner or otherwise) any business that: (a) offers products or services which involve the inhabitation of property by, and control of, birds and waterfowl; and (b) is, or is intended to be, located at or within:

      16.2.3.1   the county or municipality in which the Approved Location is located; or

      16.2.3.2   the Protected Territory; or

      16.2.3.3   one hundred fifty (150) miles of the Approved Location; or

      16.2.3.4   one hundred fifty (150) miles of any business operating under the Proprietary Marks.

    16.3   Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not, for a continuous uninterrupted period of two (2) years commencing upon the date of: (a) a transfer permitted under Section 13 of this Agreement; (b) expiration of this Agreement; (c) termination of this Agreement (regardless of the cause for termination); (d) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Section 16; or (e) any or all of the foregoing; either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that: (i) involve the inhabitation of property by, and control of, birds and waterfowl; and (ii) is, or is intended to be, located at or within:

      16.3.1   the county or municipality in which the Approved Location is located; or

      16.3.2   the Protected Territory; or

      16.3.3   one hundred fifty (150) miles of the Approved Location; or

16.3.4  one hundred fifty (150) miles of any business operating under the Proprietary Marks; provided, however, that this provision shall not apply to the operation by Franchisee of any business under the System which may be franchised by Franchisor to Franchisee.

16.4   Sections 16.2.3 and 16.3 shall not apply to ownership by Franchisee of a less than five percent (5%) beneficial interest in the outstanding equity securities of any corporation which has securities registered under the Securities Exchange Act of 1934.

16.5   Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Sections 16.2 and 16.3, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 22 hereof.

16.6   Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 16.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with the enforcement of this Section 16.

16.7   At Franchisor's request, Franchisee shall obtain and furnish to Franchisor executed covenants similar in substance to those set forth in this Section 16 (including covenants applicable upon the termination of a person's relationship with Franchisee and the provisions of Section 15 of this Agreement as modified to apply to an individual) from any or all of the following persons:  (a) all personnel employed by Franchisee who have received or will receive training from Franchisor; (b) all officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of Franchisee, and of any corporation directly or indirectly controlling, controlled by, or under common control with, Franchisee, if Franchisee is a corporation; (c) the general partners and any limited partners (including any corporation, and the officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of any corporation which controls, directly or indirectly, any general or limited partner), if Franchisee is a partnership; and (d) the members (including any corporation, and the officers, directors, and holders of a beneficial interest of five percent (5%) or more of the securities of any corporation which controls, directly or indirectly, any member), if Franchisee is a limited liability company.  Every covenant required by this Section 16.7 shall be in a form approved by Franchisor, including, without limitation, specific identification of Franchisor as a third-party beneficiary of such covenants with the independent right to enforce them.

17.   CORPORATE, PARTNERSHIP OR LIMITED LIABILITY COMPANY FRANCHISEE

17.1   If Franchisee, or any successor to or assignee of Franchisee is a corporation, Franchisee shall comply with the following requirements:

-27-

17.1.1  Franchisee shall be newly organized and its charter shall at all times provide that its activities are confined exclusively to operating the Franchised Business.

17.1.2  Copies of Franchisee's Articles of Incorporation, Bylaws, and other governing documents, and any amendments thereto, including the resolution of the Board of Directors authorizing entry into this Agreement, shall be promptly furnished to Franchisor.

17.1.3  Franchisee shall maintain stop-transfer instructions against the transfer on its records of any equity securities; and each stock certificate of Franchisee shall have conspicuously endorsed upon its face a statement in a form satisfactory to Franchisor that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement; provided, however, that the requirements of this Section 17.1.3 shall not apply to a publicly-held corporation.

17.1.4  Franchisee shall maintain a current list of all owners of record and all beneficial owners of any class of voting securities or securities convertible into voting securities of Franchisee and shall furnish the list to Franchisor upon request.

17.2    If Franchisee or any successor to or assignee of Franchisee is a partnership, it shall comply with the following requirements:

17.2.1  Franchisee shall furnish Franchisor with a copy of its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto.

17.2.2  The partnership agreement shall at all times note conspicuously that partnership rights are held subject to, and that further assignment or transfer thereof are subject to, all restrictions imposed upon assignments by this Agreement.

17.2.3  Franchisee shall prepare and furnish to Franchisor, upon request, a list of all general and limited partners in Franchisee.

17.3    If Franchisee or any successor to or assignee of Franchisee is a limited liability company, it shall comply with the following requirements:

17.3.1  Franchisee shall furnish Franchisor with a copy of its articles of organization and operating agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto.

17.3.2  The articles of organization or operating agreement shall at all times note conspicuously that membership rights are held subject to, and that further assignment or transfer thereof are subject to, all restrictions imposed upon assignments by this Agreement.

17.3.3  Franchisee shall prepare and furnish to Franchisor, upon request, a list of all members in Franchisee.

17.4    Franchisee's shareholders, partners, or members shall execute Franchisor's Guarantee, Indemnification, and Acknowledgment, in the form attached hereto as Exhibit C.

18.    TAXES, PERMITS, AND INDEBTEDNESS

18.1    Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the operation of the Franchised Business. Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

18.2    In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall Franchisee permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against the Premises of the Franchised Business, or any improvements thereon.

18.3    Franchisee shall comply with all federal, state, and local laws, rules, and regulations (including, without limitation, the applicable provisions of the ADA regarding the construction, design and operation of the Franchised Business if the Franchised Business is not located at Franchisee's personal residence), and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the Franchised Business, including, without limitation, licenses to do business, fictitious name registrations, and sales tax permits.

18.4    Franchisee shall immediately notify Franchisor in writing of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Franchised Business.

19.    RELATIONSHIP OF THE PARTIES AND INDEMNIFICATION

19.1    This Agreement does not create a fiduciary relationship between the parties. Franchisee shall be an independent contractor of Franchisor, and nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, partner, joint venturer, employee, or servant of the other for any purpose whatsoever. Franchisee shall not, without the prior written approval of Franchisor, have any power to obligate Franchisor for any expenses, liabilities or other obligations, other than as is specifically provided for in this Agreement. Franchisor shall not have the power to hire or fire Franchisee's employees and Franchisor may not control or have access to Franchisee's funds or the expenditure thereof or in any other way exercise dominion or control over the Franchised Business. No employee of Franchisee shall be deemed to be an employee of Franchisor.

19.2    It is expressly understood and agreed that neither Franchisee nor any employee of Franchisee whose compensation for services is paid by Franchisee may, in any way, directly or indirectly, expressly or by implication, be construed to be an employee of Franchisor or any of its affiliates for any purpose, including, without limitation, any mandated or other insurance

coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state or federal governmental agency.

19.3    Franchisee shall conspicuously identify itself and its vehicles, and in all dealings with its clients, contractors, suppliers, public officials and others, as an independent Franchisee of Franchisor, and shall place such notice of independent ownership on all vehicles, forms, business cards, stationery, advertising, signs and other materials in such fashion as Franchisor may reasonably specify and require from time to time.

19.4    Except as otherwise expressly authorized by this Agreement, neither party hereto will make any express or implied agreements, warranties, guaranties or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between Franchisor and Franchisee is other than that of Franchisor and Franchisee. Franchisor does not assume any liability, and will not be deemed liable, for any agreements, representations, or warranties made by Franchisee which are not expressly assumed by Franchisor in writing, nor will Franchisor be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Franchised Business.

19.5    Except as described in Section 7.2.8 hereof, Franchisee agrees at all times to defend at its own cost, and to indemnify and hold Franchisor, its affiliates, and their respective directors, officers, employees, agents, shareholders, designees, and representatives thereof (collectively "Indemnitees") harmless from and against all losses and expenses (as defined in Section 19.6) incurred in connection with any action, suit, proceeding, claim, demand, investigation, or formal or informal inquiry (regardless of whether same is reduced to judgment) ("claim") or any settlement thereof which arises out of or is asserted against Franchisor by reason of the operation of the Franchised Business including, but not limited to, alleged violation or breach of any contract, federal, state or local law, regulation, ruling, standard or directive or of any industry standard; libel or slander; or Franchisee's alleged violation or breach of any warranty, representation, agreement or obligation in this Agreement.

19.6    The term "losses and expenses" shall be deemed to include, but is not limited to, all losses (whether direct, consequential, or other), compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, reasonable attorneys' fees and expenses, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing same, and any and all expenses of recall, refunds, compensation, and/or public notices.

19.7    Franchisee agrees to give Franchisor immediate notice of any such claim under this Section 19. At Franchise's expense, Franchisor may elect to assume (but is not obligated to undertake) the defense and/or settlement of any such claim with counsel of Franchisor's own choosing, provided that Franchisor will seek the advice and counsel of Franchisee, and will keep Franchisee informed, with regard to any such proposed or contemplated settlement(s).

19.8    Indemnitees do not assume any liability whatsoever for acts, errors, or omissions of those with whom Franchisee may contract, regardless of the purpose. Franchisee shall hold harmless and indemnify Indemnitees for all losses and expenses which may arise out of acts,

-30-

errors or omissions of these third parties. Indemnitees shall not be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against Franchisee. Franchisee agrees that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by Indemnitees from Franchisee.

20.   APPROVALS AND WAIVERS

20.1   Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent must be obtained in writing.

20.2   Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay, or denial of any request therefor.

20.3   No failure of Franchisor to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms hereof. Waiver by Franchisor of any particular default of Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, force, or omission of Franchisor to exercise any power or right arising out of any breach of default by Franchisee of any of the terms, provisions, or covenants hereof, affect or impair Franchisor's right to exercise the same, nor shall such constitute a waiver by Franchisor of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants, or conditions of this Agreement.

20.4   **WAIVER OF RIGHT TO A JURY AND PUNITIVE DAMAGES.** FRANCHISOR AND FRANCHISEE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY AGREE AS FOLLOWS:

20.4.1   Franchisor and Franchisee both EXPRESSLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY in any action, proceeding or counterclaim brought by or against either party;

20.4.2   Franchisor and Franchisee both EXPRESSLY WAIVE ANY CLAIM FOR PUNITIVE, MULTIPLE, AND/OR EXEMPLARY DAMAGES, except that Franchisor shall be free at any time hereunder to bring an action for willful trademark infringement and, if successful, to receive an award of multiple damages as provided by law.

21.   NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by registered mail, or sent by other means which affords the sender evidence of delivery or rejected delivery, to the respective parties at the following

-31-

addresses, unless and until a different address has been designated by written notice to the other
party:

|                         |                         |
|-------------------------|-------------------------|
| Notices to Franchisor:  | GPI, LLC |
|                         | 126 South Main Street |
|                         | Farmingdale, New Jersey 07727 |
|                         | Attn:  Ms. Dianne Neveras |
|                         | |
| Notices to Franchisee:  | **Dog Gone Geese, Inc.**    REDACTED |
|                         | **Leesburg, VA  20175** |
|                         | **Attn:  Cathy Fiddler** |

Any notice by a means which affords the sender evidence of delivery or rejected delivery
shall be deemed to have been given and received at the date and time of receipt or rejected
delivery.

22.    MISCELLANEOUS

22.1    Neither Franchisor nor Franchisee shall be held liable for failure to comply with
any of the terms of this Agreement when such failure is caused directly or indirectly by fire,
strike, declared or undeclared war, terrorist acts, riots, insurrections, government restrictions or
other acts, or causes beyond the control of and without fault of either them or their employees,
agents, or representatives.

22.2    This Agreement may be executed in any number of identical counterparts, and
each such counterpart shall be deemed a duplicate original hereof.

22.3    This Agreement, the attachments hereto, and the documents referred to herein
constitute the entire Agreement between Franchisor and Franchisee concerning the subject
matter hereof, and supersede any prior agreements, no other representations having induced
Franchisee to execute this Agreement. Except for those permitted to be made unilaterally by
Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding
on either party unless mutually agreed to by the parties and executed by their authorized officers
or agents in writing.  Notwithstanding the foregoing, nothing in this Agreement is intended to
disclaim the representations made by Franchisor in the franchise disclosure document furnished
to Franchisee.

23.    SEVERABILITY AND CONSTRUCTION

23.1    If, for any reason, any section, part, term, provision, and/or covenant herein is
determined to be invalid and contrary to, or in conflict with, any existing or future law or
regulation by a court or agency having valid jurisdiction, such shall not impair the operation of,
or have any other effect upon, such other portions, sections, parts, terms, provisions, and/or
covenants of this Agreement as may remain otherwise intelligible; and the latter shall continue to
be given full force and effect and bind the parties hereto; and said invalid portions, sections,
parts, terms, provisions, and/or covenants shall be deemed not to be a part of this Agreement.

23.2    Any provision or covenant in this Agreement which expressly or by its nature imposes obligations beyond the expiration, termination (regardless of cause for termination) or assignment of this Agreement shall survive such expiration, termination, or assignment, including, but not limited to, Sections 9, 15, 16, 23, and 24.

23.3    Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, shareholders, agents, and employees, and such of Franchisor's successors and assigns as may be contemplated by Section 13 hereof, any rights or remedies under or by reason of this Agreement.

23.4    Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court or agency having valid jurisdiction may hold to be unreasonable and unenforceable in an unappealed final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court or agency order.

23.5    Section headings are for ease of reference only.  They are not a part of this Agreement and shall not limit or define the meaning of any provision.

23.6    Any personal pronoun shall include the masculine, feminine and/or neuter thereof, and the singular of any noun or pronoun shall include the plural and plural the singular, wherever the context may require.

24.    GRANT OF SECURITY INTEREST

24.1    For valuable consideration, receipt of which is hereby acknowledged, Franchisee hereby grants to Franchisor a security interest in all of Franchisee's rights in its leasehold interest for the Approved Location and in all of Franchisee's assets, whether now owned or hereafter acquired, used in connection with the Franchised Business, including, without limitation, all Goods, Equipment (other than leasehold improvements which constitute fixtures), Inventory, Instruments, Accounts, Chattel Paper, General Intangibles, Deposit Accounts, Electronic Chattel Paper, Letter of Credit Rights, Software (as such terms are defined in the UCC) and any other property, and any and all additions and accessions thereto, all substitutions and replacements therefor and all products and proceeds thereof or proceeds of insurance thereon, as security for the payment and performance of all obligations owed by Franchisee to Franchisor or any of its Affiliates under this Agreement including, without limitation, the payment of royalty fees, Advertising Fund contributions and any and all other fees and amounts owed by Franchisee to Franchisor or any of its Affiliates hereunder and the performance of the in-term non-competition obligations and the post-term non-competition and disassociation obligations.  Franchisee acknowledges that this Agreement shall constitute a security agreement under the UCC for purposes of establishing the respective rights of Franchisor and Franchisee in the above-described personal property and the enforcement of such security interest against Franchisee.

-33-

24.2    Franchisee hereby authorizes Franchisor to file one or more financing statements pursuant to the UCC from time to time.

24.3    Upon the occurrence of any of the events described in Section 14 of this Agreement, Franchisor shall have the rights and remedies of a secured party under the UCC.

24.4    Franchisee acknowledges and agrees with Franchisor that, upon a foreclosure on the collateral described above, a sale of such collateral may be limited to a buyer who will continue to operate the Franchised Business under the Proprietary Marks and using the System and that such a limitation is commercially reasonable as it will save the buyer the costs to be incurred in disassociating the collateral from the Proprietary Marks so that such cost savings may be included as part of the purchase price for the collateral.

25.    APPLICABLE LAW; DISPUTE RESOLUTION

25.1    This Agreement shall be interpreted and construed in accordance with the laws of the State of New Jersey, notwithstanding any conflict of laws rules.

25.2    In the event Franchisor takes any action or commences any legal proceeding to enforce any provision of this Agreement and prevails in such action or proceeding, Franchisor shall be entitled to recover its reasonable costs and expenses, including reasonable attorney's fees, incurred thereby.  If Franchisee takes any action or commences any proceeding arising under this Agreement and does not prevail therein, Franchisor shall be entitled to recover (from Franchisee) its reasonable costs and expenses, including reasonable attorney's fees, incurred therefrom.

25.3    In the event of any controversy, dispute or claim (individually, a "Claim" and collectively, "Claims") arising out of or relating to this Agreement, or any modification, amendment or extension to this Agreement, or the breach thereof, including any claim to rescind or set aside any of the same other than:  (i) disputes, whether between Franchisor and Franchisee or with third parties, relating to Franchisor's right to license, and Franchisee's use of, the Proprietary Marks or the System; (ii) suits to enforce the in-term and post-term noncompetition agreements of Franchisee; or (iii) actions by Franchisor for the collection of amounts due from Franchisee (collectively, the "Non-Mediation Matters"), representatives of Franchisor and Franchisee shall meet in good faith as set forth in this Section 5.3 in an effort to resolve the dispute.

25.3.1 The parties hereto first agree to endeavor to settle in an amicable manner by mediation all disputes and claims relating to this Agreement, the rights and obligations of the parties hereto, or any other claims or causes of action relating to the making, interpretation, or performance of either party under this Agreement, at the office of JAMS located in the principal city closest to the Franchisor's principal place of business, as reasonably determined by Franchisor in accordance with the Commercial Mediation Rules of JAMS.  The following shall supplement and, in the event of a conflict, shall govern such mediation.  The parties shall select one (1) mediator from a list provided by JAMS.  JAMS shall only list available attorneys with at least ten (10) years of experience in the practice of franchise law.  In selecting the mediator from the list provided by JAMS, Franchisor and Franchisee shall make the selection by the striking

method. Franchisor and Franchisee shall each bear all of their own costs of mediation; provided, however, the fees of the mediator shall be divided equally between Franchisor and Franchisee.

25.3.2  The periods set forth in this Section 25.3 may be extended or shortened by mutual agreement of the parties. In no event shall a party who has refused or failed to participate in the dispute resolution process described in this Section 25.3 be permitted to commence an arbitration proceeding without first complying with the provisions of this Section 25.3.

25.3.3  The parties hereto agree that notwithstanding, and in addition to, the rights and remedies available hereunder, each of Franchisor, and Franchisee, reserves the right to seek and obtain temporary restraining orders or other emergency temporary or preliminary equitable injunctive relief from the courts of the state of New Jersey or the federal courts situated in the state of New Jersey, to preserve the status quo by enjoining or restraining a party hereto pending mediation hereunder or to compel mediation as provided herein, and the parties hereto acknowledge and agree to the right to seek such relief. The parties hereto expressly agree and acknowledge that seeking relief from the courts as provided in this Section 25.3 shall not be deemed a waiver of any party's right to mediate nor shall the existence or exercise of such right be deemed to be an adequate remedy at law in connection therewith.

25.3.4  Each party shall bear its own attorneys' fees and expenses and the fees and expenses of other experts or professionals utilized by such party in connection with the mediation provided for herein.

25.3.5  Each of the parties hereto (including those persons executing the Guarantee, Indemnification and Acknowledgment) hereby irrevocably consents and submits to the exclusive personal jurisdiction of United States District Court - District of New Jersey and the courts of the state of New Jersey over any suit or action to compel mediation in accordance with the provisions of this Section 5.3 between Franchisor and Franchisee, and irrevocably agrees that venue is proper in such courts for any such suit or action and that all claims with respect thereto may be heard and determined in either such court. Service of process in any such suit or action may be made in the manner in this Agreement set forth for the giving of notices and the same shall constitute valid personal service for all purposes, each party, hereby waiving personal service by other means.

25.4    Except as otherwise provided herein, and in the event that any dispute or claim hereunder has not been successfully resolved through mediation, as required by Section 25.3 hereof, all disputes or claims relating to this Agreement, the rights and obligations of the parties hereto, or any other claims or causes of action relating to the making, interpretation, or performance of either party under this Agreement, shall be settled solely and exclusively by final and binding arbitration at the office of JAMS located in the principal city closest to the Franchisor's principal place of business, as reasonably determined by Franchisor, in accordance with the Commercial Arbitration Rules of JAMS. The following shall supplement and, in the event of a conflict, shall govern such arbitration. The parties shall select one (1) arbitrator from a list provided by JAMS. JAMS shall only list available attorneys with at least ten (10) years of experience in the practice of franchise law. In selecting the arbitrator from the list provided by JAMS, Franchisor and Franchisee shall make the selection by the striking method. Franchisor

and Franchisee shall each bear all of their own costs of arbitration; provided, however, the fees of the arbitrator shall be divided equally between Franchisor and Franchisee.

25.5    Franchisor and Franchisee hereby waive to the fullest extent permitted by law any right to or claim of any punitive or exemplary damages against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained by it.

25.6    Any and all claims and actions arising out of or relating to this Agreement, the relationship of Franchisee and Franchisor, or Franchisee's operation of the Franchised Business, brought by Franchisee against Franchisor, shall be commenced within one (1) year from the occurrence of the facts giving rise to such claim or action, or such claim or action shall be barred.

25.7    Nothing herein contained shall bar Franchisor's right to obtain injunctive relief against threatened conduct that will cause it loss or damage, under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions.

25.8    No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

25.9    Each of the parties hereto (including those persons executing the Guarantee, Indemnification and Acknowledgment) hereby irrevocably consents and submits to the personal jurisdiction of the United States District Court - District of New Jersey and the courts of the state of New Jersey over all Non-Mediation Matters and hereby agrees that venue is proper in such courts for any Non-Mediation Matter. To the fullest extent permitted by law, Franchisor and Franchisee hereby waive their respective rights to a trial by jury in any Non-Mediation Matter. The parties acknowledge and agree that the rights of Franchisor under this Agreement with respect to the use of the Proprietary Marks and the System and the enforcement of the in-term and post-term noncompetition agreements of Franchisee are of a specialized and unique character and that immediate and irreparable damage will result to Franchisor if Franchisee fails or refuses to perform its obligations under this Agreement and, notwithstanding any election by Franchisor to claim damages from Franchisee as a result of any such failure or refusal, AFB may, in addition to any other remedies and damages available, seek an injunction in a court of competent jurisdiction to restrain any such failure or refusal.

26.    ACKNOWLEDGMENTS

26.1    Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, the ability of its principals) as an independent businessperson. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee,

express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

26.2    Franchisee acknowledges that it received a complete copy of this Agreement, the attachments hereto, and agreements relating thereto, if any, at least seven (7) calendar days prior to the date on which this Agreement was executed. Franchisee further acknowledges that it received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising" at least fourteen (14) calendar days prior to the date on which this Agreement was executed.

26.3    Franchisee acknowledges that it has read and understood this Agreement, the attachments hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

26.4    Franchisee acknowledges that under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (the "Executive Order"), Franchisor is prohibited from engaging in any transaction with any person engaged in, or with a person aiding any person engaged in, acts of terrorism, as defined in the Executive Order. Accordingly, Franchisee represents and warrants to Franchisor that as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in Franchisee, controlled by Franchisee, or under common control with Franchisee is designated under the Executive Order as a person with whom business may not be transacted by Franchisor, and that Franchisee (a) does not, and hereafter shall not, engage in any terrorist activity; (b) is not affiliated with and does not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (c) is not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity.

[SIGNATURE PAGE FOLLOWS]

-37-

Case 3:18-cv-05122-FLW-TJB   Document 1-6   Filed 04/02/18   Page 42 of 51 PageID: 90

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

FRANCHISEE

By: _____

Name: **Cathy Fiddler** Benedict

Title: **Owner of Dog Gone Geese, Inc.**
I word
CAr

Witness/Attest

~GPI, LLC

By: _____

Name: **Dianne Neveras**

Title: **Member**

-38-

## EXHIBIT A

## SITE SELECTION ADDENDUM

GPI, LLC ("Franchisor") and **Dog Gone Geese, Inc. d/b/a Geese Police® of Virgina** ("Franchisee") have this 31th day of August, 2009, entered into a franchise agreement ("Franchise Agreement") and desire to supplement its terms, as set forth below. The parties therefore agree as follows:

1.     Within ninety (90) days after execution of the Franchise Agreement, Franchisee shall obtain a site, at Franchisee's expense, for the business franchised under the Franchise Agreement (the "Franchised Business"), which site shall be approved by Franchisor as hereinafter provided. The site shall be within the following territory:

**The following Counties in Virginia – Counties of Loudoun, Clark and the Towns of Reston, VA and Herndon, VA,** ("Site Selection Territory").

2.     Failure by Franchisee to obtain a site for the Franchised Business within the time required in Paragraph 1 hereof, shall constitute a default under the Franchise Agreement and this Site Selection Addendum. In the event of such default, Franchisor shall have the right to terminate the Franchise Agreement or, in its sole discretion, to extend the time period specified in Paragraph 1 hereof by an additional ninety (90) days.

3.     Franchisor shall not establish, nor franchise another to establish, a business operating under the System within the Site Selection Territory until Franchisor approves a location for the Franchised Business franchised under the Franchise Agreement, or until the time set forth in Paragraph 1 hereof expires, whichever event first occurs.

4.     Prior to Franchisee's acquisition by lease or purchase of a site for the Franchised Business, Franchisee shall submit to Franchisor, in the form specified by Franchisor, a completed site questionnaire, including, without limitation, forms, photographs, interior information, and such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor which confirms Franchisee's favorable prospects for obtaining the proposed site. Recognizing that time is of the essence, Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 4, to Franchisor for its approval within forty-five (45) days after execution of this Site Selection Addendum. Franchisor shall have twenty-five (25) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Franchised Business. No proposed site shall be deemed approved unless it has been expressly approved in writing by Franchisor.

5.     Franchisor shall furnish to Franchisee the following:

5.1     Such consultation as Franchisor deems advisable; and

5.2     Such on-site evaluation as Franchisor deems advisable as part of its evaluation of Franchisee's request for site approval. Franchisor shall not, however, provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information and

1

materials required by Paragraph 4 hereof. If Franchisor provides on-site evaluation, Franchisee shall reimburse Franchisor for all reasonable expenses incurred by Franchisor or its designated agents in connection with such evaluation, including, without limitation, the costs of travel, lodging, and meals.

6.      Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the site for the Franchised Business or for any other purpose, or of its compliance with any applicable zoning or land-use regulations or ordinances and any federal, state and local laws, codes and regulations including, without limitation, the applicable provisions of the Americans with Disabilities Act regarding the construction, design and operation of the Franchised Business if Franchisee operates the Franchised Business at an office location instead of at Franchisee's personal residence. Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for its purposes as of the time of the evaluation. Both Franchisee and Franchisor acknowledge that application of criteria that have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site. Such factors are unpredictable and are beyond Franchisor's control. Franchisor shall not be responsible for the failure of a site approved by Franchisee to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that its acceptance of a franchise for the operation of the Franchised Business at the site is based on its own independent investigation of the suitability of the site.

7.      If Franchisee will occupy the premises of the Franchised Business under a lease, Franchisee shall, prior to the execution of the lease, submit the lease to Franchisor for its written approval. Franchisor's approval of the lease may be conditioned upon the inclusion of the following terms and conditions:

        7.1     That the initial term of the lease, or the initial term together with renewal terms, shall be for not less than five (5) years;

        7.2     That Franchisee be prohibited from subleasing or assigning all or any part of its occupancy rights or extending the term of or renewing the lease without Franchisor's prior written consent;

        7.3     That the lessor provide to Franchisor copies of any and all notices of default or any allegations of default under any term of the lease given to Franchisee under the lease at least thirty (30) days prior to any action by lessor;

        7.4     That Franchisor (or Franchisor's designee) have the option, upon default, expiration, or termination of the Franchise Agreement, and upon notice to the lessor, to assume all of Franchisee's rights under the lease terms, including the right to assign or sublease; and

2

7.5     That the lease does not create or purport to create any obligations on behalf of Franchisor to the lessor, or grant or purport to grant to the lessor any rights against Franchisor, or contain any term, condition, or covenant that is inconsistent with any provision of this Agreement or the Franchise Agreement.

8.     Franchisee shall furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

9.     After a site for the Franchised Business has been approved in writing by Franchisor and acquired by Franchisee pursuant to Paragraph 4 hereof, the site shall constitute the Approved Location referred to in Section 1.2 of the Franchise Agreement.

10.     This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and the terms of this Site Selection Addendum shall be controlling with respect to the subject matter hereof.  Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum on the day and year first above written.

Witness/Attest

FRANCHISEE:

By: _____

Name:  **Cathy Benedict**

Title:  **President of Dog Gone Geese, Inc.**

~GPI, LLC

By: _____

Name:  **Dianne Neveras**

Title:  **Member**

3

**EXHIBIT B**

**ADA CERTIFICATION** *Word*                                          **REDACTED**

     GPI, LLC ("Franchisor") and **Dog Gone Geese, Inc. d/b/a Geese Police® of Virginia** ("Franchisee") are parties to a franchise agreement dated August 31, 2009 (the "Franchise Agreement") for the operation of a goose control franchised business at **Leesburg, VA  20175**(the "Franchised Business").  In accordance with Paragraph  1.5 of the Franchise Agreement, Franchisee certifies to Franchisor that, to the best of Franchisee's knowledge, the Franchised Business and its adjacent areas comply with all applicable federal, state and local accessibility laws, statutes, codes, rules, regulations and standards, including but not limited to the Americans with Disabilities Act.  Franchisee acknowledges that it is an independent contractor and the requirement of this certification by Franchisor does not constitute ownership, control, leasing or operation of the Franchised Business.  Franchisee acknowledges that Franchisor has relied on the information contained in this certification.  Furthermore, Franchisee agrees to indemnify Franchisor and the officers, directors, and employees of Franchisor in connection with any and all claims, losses, costs, expenses, liabilities, compliance costs, and damages incurred by the indemnified party(ies) as a result of any matters associated with Franchisee's compliance with the Americans with Disabilities Act, as well as the costs, including attorneys' fees, related to the same.

     IN WITNESS WHEREOF, the undersigned has executed this ADA Certification on the date August 31, 2009.

FRANCHISEE:

By: _____

Witness/Attest

Name:  Cathy ~~Fiddler~~

Title:  Owner of Dog Gone Geese, Inc.

*/ Word*

1

## EXHIBIT C

## GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to GPI, LLC ("Franchisor") to execute the Franchise Agreement between Franchisor and **Dog Gone Geese, Inc. d/b/a Geese Police® of Virginia** ("Franchisee") dated August 31, 2009 (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon demand by Franchisor, the undersigned will immediately make each payment required of Franchisee under the Agreement. The undersigned hereby waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify, and hold Franchisor and its affiliates harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants contained in Sections 9, 15, 16, 20 and 24 of the Agreement.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 24 of the Agreement. This Guarantee shall be interpreted and construed under the laws of the State of New Jersey, notwithstanding any conflict of laws rules.

The Guarantors agree that the dispute resolution and attorney fee provisions in Section 24 of the Agreement are hereby incorporated into this Agreement by reference, and references to

1

"Franchisee" and the "Franchise Agreement" therein shall be deemed to apply to "Guarantors" and this "Guarantee", respectively, herein.

Any and all notices required or permitted under this Guarantee shall be in writing and shall be personally delivered, sent by registered mail, or sent by other means which afford the sender evidence of delivery or rejected delivery, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:          GPI, LLC
                                126 South Main Street
                                Farmingdale, New Jersey 07727
                                Attn: Ms. Dianne Neveras

Notices to Guarantors:          Dog Gone Geese, Inc.                **REDACTED**
                                P.O. Box 2608,
                                Leesburg, VA  20175
                                Attn: Cathy ~~Fiddler~~ Benedict

Any notice by a method which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given at the date and time of receipt or rejected delivery.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

                                GUARANTORS

                                _Cathy Benedict_
                                Name

                                **REDACTED**
                                _____

                                Social Security Number
                                                                    **REDACTED**

                                Residence Address   _Leesburg VA 20175_

STATE OF_____)
                  )
COUNTY OF _____)

Personally appeared before me this _____ day of _____, 20_____,
_____ and _____, to
me known to be the persons who executed the foregoing Guarantee.

                                Notary Public: _Nicole Jeffers_

(NOTARY SEAL)                   My Commission Expires:

                                ┌─────────────────────────────┐
                                │    NICOLE SUEN JEFFERS       │
                                │   Commission # 2392684       │
                                │ Notary Public, State of New Jersey │
                                │   My Commission Expires      │
                                │     January 12, 2015         │
                                └─────────────────────────────┘

                                2

# AMENDMENT TO FRANCHISE AGREEMENT

## AMENDMENT TO THE GPI, LLC FRANCHISE AGREEMENT
## FOR RENEWAL OF FRANCHISE AGREEMENT

The following are changes to the GPI, LLC franchise agreement for the purpose of renewal of the franchise agreement.

The following will be deleted to the agreement as it does not apply to a renewal:

Section

4.2     Franchisee shall purchase from Franchisor or a breeder specified by Franchisor, prior to attending Franchisor's initial training program under Section 5.1 hereof, the first two (2) trained Border Collies for use by the Franchised Business, for a total cost of between Ten Thousand Dollars ($10,000) and Fourteen Thousand Dollars ($14,000).

5.1     Prior to the opening of the Franchised Business, Franchisee (or, if Franchisee is a corporation, partnership, or limited liability company a principal of Franchisee acceptable to Franchisor) or Franchisee's manager (if Franchisee or Franchisee's principal will not manage the Franchised Business) or both, at Franchisor's option, shall attend and complete to franchisor's satisfaction the initial training program for franchisees offered by Franchisor.

6.1     Franchisee shall obtain Franchisor's written approval prior to opening the Franchised Business, which approval shall not be unreasonably withheld, and shall open the Franchised Business within one hundred eighty (180) days after the date of this Agreement. The parties agree that time is of the essence in the opening of the Franchised Business.

Delete Exhibit A-Site Selection Addendum as it is not applicable.

The following will be amended to the agreement as follows:

4.1     In consideration of the franchise *renewal* granted, Franchisee shall pay to Franchisor a renewal fee of Five Thousand Dollars ($5,000), receipt of which is hereby acknowledged, which is fully earned and non-refundable in consideration of administrative and other expenses incurred by Franchisor in entering into this Agreement and for Franchisor's lost or deferred opportunity to enter into this Agreement with others.

## STANDARD ADDENDUM TO THE GPI, LLC
## RENEWAL FRANCHISE AGREEMENT

THIS ADDENDUM is effective this 31st day of August, 2009, by and between GPI LLC, a New Jersey limited liability company, with its principal place of business at126 South Main Street, Farmingdale, New Jersey 07727 ("Franchisor") and Dog Gone Geese, Inc. d/b/a Geese Police of Virginia with its principal address of **P.O. Box 2608**, **REDACTED**, Leesburg, VA 20175 ("Franchisee").

WHEREAS, the parties have executed a certain Franchise Agreement (the "Agreement"); dated as of 31st day of August 2009; and

WHEREAS, the parties desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the covenants herein and for other consideration, the receipt of sufficiency of which is acknowledged, the parties hereto intending to be legally bound, do agree as follows:

1) Section 4.1 shall be deleted and replaced with the following language:

In consideration of the franchise *renewal* granted, Franchisee shall pay to Franchisor a renewal fee of Two Thousand Five Hundred Dollars ($2,500.00), receipt of which is hereby acknowledged, which is fully earned and non-refundable in consideration of administrative and other expenses incurred by Franchisor in entering into this Agreement and for Franchisor's lost or deferred opportunity to enter into this Agreement with others.

2) Section 4.2 shall be deleted in its entirety.

3) Sections 5.1 and 6.1 shall be deleted in their entirety.

4) Exhibit A of the Franchise Agreement shall be deleted in its entirety.

5) Except as set forth herein, all other terms and provisions of the Franchise Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum as of the day and year first above written.

FRANCHISEE                                    GPI, LLC

By: _____          By: _____

Name: **Cathy Benedict**                    Name: **Dianne Neveras**

Title: **Owner of Dog Gone Geese Inc.**      Title: Member, V. President & Dir of
**d/b/a Geese Police® of VA**                 Franchise Operations

# DEX 2

## EXHIBIT C

### GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to GPI, LLC ("Franchisor") to execute the Franchise Agreement between Franchisor and **Dog Gone Geese, Inc. d/b/a Geese Police® of Virginia** ("Franchisee") dated August 31, 2009 (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon demand by Franchisor, the undersigned will immediately make each payment required of Franchisee under the Agreement.  The undersigned hereby waive any right to require Franchisor to:  (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee.  The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify, and hold Franchisor and its affiliates harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants contained in Sections 9, 15, 16, 20 and 24 of the Agreement.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 24 of the Agreement. This Guarantee shall be interpreted and construed under the laws of the State of New Jersey, notwithstanding any conflict of laws rules.

The Guarantors agree that the dispute resolution and attorney fee provisions in Section 24 of the Agreement are hereby incorporated into this Agreement by reference, and references to

1

"Franchisee" and the "Franchise Agreement" therein shall be deemed to apply to "Guarantors" and this "Guarantee", respectively, herein.

Any and all notices required or permitted under this Guarantee shall be in writing and shall be personally delivered, sent by registered mail, or sent by other means which afford the sender evidence of delivery or rejected delivery, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:     GPI, LLC
126 South Main Street
Farmingdale, New Jersey 07727
Attn: Ms. Dianne Neveras

Notices to Guarantors:     Dog Gone Geese, Inc.     **REDACTED**
P.O. Box 2608,
Leesburg, VA 20175
Attn: Cathy ~~Fiddler~~ *Benedict*

Any notice by a method which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given at the date and time of receipt or rejected delivery.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

GUARANTORS

*Cathy Benedict*

Name

**REDACTED**

Social Security Number

**REDACTED**

Residence Address *Leesburg VA 20175*

STATE OF_____ )
                   )
COUNTY OF _____ )

Personally appeared before me this _____ day of _____, 20_____,
_____ and _____, to
me known to be the persons who executed the foregoing Guarantee.

Notary Public: *Nicole Jeffers*

(NOTARY SEAL.)      My Commission Expires:

NICOLE SUEN JEFFERS
Commission # 2392884
Notary Public, State of New Jersey
My Commission Expires
January 12, 2015

2

# AMENDMENT TO FRANCHISE AGREEMENT

## AMENDMENT TO THE GPI, LLC FRANCHISE AGREEMENT
## FOR RENEWAL OF FRANCHISE AGREEMENT

The following are changes to the GPI, LLC franchise agreement for the purpose of renewal of the franchise agreement.

The following will be deleted to the agreement as it does not apply to a renewal:

Section

4.2    Franchisee shall purchase from Franchisor or a breeder specified by Franchisor, prior to attending Franchisor's initial training program under Section 5.1 hereof, the first two (2) trained Border Collies for use by the Franchised Business, for a total cost of between Ten Thousand Dollars ($10,000) and Fourteen Thousand Dollars ($14,000).

5.1    Prior to the opening of the Franchised Business, Franchisee (or, if Franchisee is a corporation, partnership, or limited liability company a principal of Franchisee acceptable to Franchisor) or Franchisee's manager (if Franchisee or Franchisee's principal will not manage the Franchised Business) or both, at Franchisor's option, shall attend and complete to franchisor's satisfaction the initial training program for franchisees offered by Franchisor.

6.1    Franchisee shall obtain Franchisor's written approval prior to opening the Franchised Business, which approval shall not be unreasonably withheld, and shall open the Franchised Business within one hundred eighty (180) days after the date of this Agreement. The parties agree that time is of the essence in the opening of the Franchised Business.

Delete Exhibit A-Site Selection Addendum as it is not applicable.

The following will be amended to the agreement as follows:

4.1    In consideration of the franchise *renewal* granted, Franchisee shall pay to Franchisor a renewal fee of Five Thousand Dollars ($5,000), receipt of which is hereby acknowledged, which is fully earned and non-refundable in consideration of administrative and other expenses incurred by Franchisor in entering into this Agreement and for Franchisor's lost or deferred opportunity to enter into this Agreement with others.

## STANDARD ADDENDUM TO THE GPI, LLC
## RENEWAL FRANCHISE AGREEMENT

THIS ADDENDUM is effective this 31st day of August, 2009, by and between GPI LLC, a New Jersey limited liability company, with its principal place of business at126 South Main Street, Farmingdale, New Jersey 07727 ("Franchisor") and Dog Gone Geese, Inc. d/b/a Geese Police of Virginia with its principal address of P.O. Box 2608, REDACTED                    , Leesburg, VA 20175 ("Franchisee").

WHEREAS, the parties have executed a certain Franchise Agreement (the "Agreement"); dated as of 31st day of August 2009; and

WHEREAS, the parties desire to amend the Agreement as set forth herein.

NOW, THEREFORE, in consideration of the covenants herein and for other consideration, the receipt of sufficiency of which is acknowledged, the parties hereto intending to be legally bound, do agree as follows:

1) Section 4.1 shall be deleted and replaced with the following language:

In consideration of the franchise *renewal* granted, Franchisee shall pay to Franchisor a renewal fee of Two Thousand Five Hundred Dollars ($2,500.00), receipt of which is hereby acknowledged, which is fully earned and non-refundable in consideration of administrative and other expenses incurred by Franchisor in entering into this Agreement and for Franchisor's lost or deferred opportunity to enter into this Agreement with others.

2) Section 4.2 shall be deleted in its entirety.

3) Sections 5.1 and 6.1 shall be deleted in their entirety.

4) Exhibit A of the Franchise Agreement shall be deleted in its entirety.

5) Except as set forth herein, all other terms and provisions of the Franchise Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly executed this Addendum as of the day and year first above written.

FRANCHISEE                                    GPI, LLC

By:                                            By:

Name: **Cathy Benedict**                       Name: **Dianne Neveras**

Title: **Owner of Dog Gone Geese Inc.**        Title: Member, V. President & Dir of
**d/b/a Geese Police® of VA**                  Franchise Operations

DEX 3

  

**GPI, LLC**
*Franchise Administrator*

**GEESE POLICE ®**

P.O. Box 656 • Howell, NJ 07731
866-NO GEESE (664-3373)
www.geesepolice.com
franchises@geesepolice.com

October 14, 2014

**VIA CERTIFIED MAIL - RETURN RECEIPT REQUESTED -#7012 2210 0000 7469 1121**

Doggone Geese, Inc.
d/b/a Geese Police of Virginia
P. O. Box 2608
Leesburg, VA 20177
Attn: Cathy P. Benedict (formerly Fiddler)

Re:     Franchise Agreement between GPI, LLC ("GPI") and Doggone Geese, Inc.
        d/b/a Geese Police of Virginia ("DGI") dated August 31, 2009, as amended by an
        Amendment to The GPI, LLC Franchise Agreement For Renewal of Franchise
        Agreement, and Standard Addendum to the GPI, LLC Renewal Franchise
        Agreement (collectively, the "Franchise Agreement")

Dear Cathy,

        The purpose of this letter is to confirm in writing the renewal of the term of the
Franchise Agreement that you have requested by exercising your first renewal option as set forth
in Section 2.2.4 of the Franchise Agreement.

        Pursuant to Section 2.2 of the Franchise Agreement, the term of the Franchise
Agreement is hereby extended from September 1, 2014 to August 31, 2019 under the same terms
and conditions as now set forth in the Franchise Agreement.

        Please acknowledge your agreement to the stated renewal by signing, dating and
returning the enclosed copy of this letter.

                                Very truly yours,

                                Dianne Neveras, Member and
                                Vice President

Accepted and agreed
to this _22_ day of
October, 2014.

DOGGONE GEESE, INC.

By: _Cathy P Benedict_____
        Cathy P. Benedict (formerly Fiddler), Owner and President

#10737169-v1;PGH1_GENERAL;GUZA1

## Receipt

This disclosure document summarizes certain provisions of the franchise agreement and other information in plain language. Read this disclosure document and all agreements carefully.

If GPI offers you a franchise, it must provide this disclosure document to you 14 calendar-days before you sign a binding agreement with, or make a payment to, the franchisor or an affiliate in connection with the proposed franchise sale or sooner if required by applicable state law.

New York and Rhode Island require that we give you this disclosure document at the earlier of the first personal meeting or 10 business days before the execution of the franchise or other agreement or the payment of any consideration that relates to the franchise relationship.

Michigan and Washington require that we give you this disclosure document at least 10 business days before the execution of any binding franchise or other agreement or the payment of any consideration, whichever occurs first.

If GPI does not deliver this disclosure document on time or if it contains a false or misleading statement, or a material omission, a violation of federal law and state law may have occurred and should be reported to the Federal Trade Commission, Washington, DC 20580 and the state agency listed on Exhibit A.

The franchisor is GPI, LLC, located at 126 South Main Street, Farmingdale, New Jersey 07727. Its telephone number is (732) 938-9093.

Issuance date: April 16, 2012

The franchise sellers for this offering listed below are located at 126 South Main Street, Farmingdale, New Jersey 07727, (732) 938-9093. Please place your initials next to the franchise sellers for this offering that you interacted with during the franchise sales process:

David Marcks    _____    Joe L. Kohl_____

Dianne Neveras    _____    Nicole Jeffers_____

Dawn M. Moro    _____    Lillian (Gigi) Gee_____

GPI authorizes the respective state agencies identified on Exhibit B to receive service of process for it in the particular state.

I received a disclosure document dated April 16, 2012 that included the following Exhibits:

| | | | |
|---|---|---|---|
| A. | State Agencies | E. | Table of Contents of Operating Manual |
| B. | Agents for Service of Process | F. | Franchise Disclosure Questionnaire |
| C-1. | Financial Statements | G. | State Addenda |
| C-2. | Guarantee of Performance | H. | Termination Agreement and Mutual Release of Claims |
| D. | Franchise Agreement | I. | Receipts |

Date: _8 - 15 - 12_

(Do not leave blank)

_____

Signature of Prospective Franchisee

_____

Print Name

You may return the signed receipt either by signing, dating, and mailing it to GPI, LLC at 126 South Main Street, Farmingdale, New Jersey 07727, or by faxing a copy of the signed and dated receipt to GPI at (732) 938-9092.

# DEX 4



# GPI, LLC

*Franchise Administrator for*

# GEESE ☆ POLICE INC.

P.O. BOX 656 • HOWELL, NJ 07731
PHONE: 732-938-9093 • FAX: 732-938-9092

February 8, 2018

**VIA EMAIL (cathy@geesepoliceloudoun.com)**
**AND U.S. CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

Doggone Geese, Inc.
d/b/a Geese Police of Virginia
P.O. Box 2608
501 Evergreen Mill Rd SE
Leesburg, VA  20175

Attn:  Cathy Fiddler Benedict

**Re:     Franchise Agreement by and between GPI, LLC ("Franchisor") and
        Doggone Geese, Inc. ("Franchisee"), as amended, and Standard Addendum to
        the GPI, LLC Renewal Franchise Agreement dated August 31, 2009 (together,
        the "Franchise Agreement")**

Dear Ms. Benedict:

       Reference is made to the Franchise Agreement.  All capitalized terms used in this letter
without definition have the meanings given them in the Franchise Agreement.

       Sections 16.2 and 16.2.3 of the Franchise Agreement provide, in part, as follows:

       "16.2   Franchisee specifically acknowledges that, pursuant to this Agreement,
Franchisee will receive valuable, specialized training and confidential information,
including, without limitation, information regarding the operational, sales, and
promotional methods and techniques of Franchisor and the System.  Franchisee covenants
that during the term of this Agreement, except as otherwise approved in writing by
Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on
behalf of, or in conjunction with any person or legal entity:

              16.2.1  Divert or attempt to divert any present or prospective business or
       customer of Franchisor or any other business operating under the System to any
       competitor, by direct or indirect inducement or otherwise, or do or perform,
       directly or indirectly, any other act injurious or prejudicial to the goodwill
       associated with the Proprietary Marks and the System;

Doggone Geese, Inc.
February 8, 2018
Page -2-

> 16.2.3  Own, maintain, operate, engage in, be employed by, provide any assistance to, or have any interest in (as owner or otherwise) any business that: (a) offers products or services which involve the inhabitation of property by, and control of, birds and waterfowl; and (b) is, or is intended to be, located at or within:
>
>> 16.2.3.1    the county or municipality in which the Approved Location is located; or
>>
>> 16.2.3.2    the Protected Territory; or
>>
>> 16.2.3.3    one hundred fifty (150) miles of the Approved Location; or
>>
>> 16.2.3.4    one hundred fifty (150) miles of any business operating under the Proprietary Marks."

Enclosed is evidence that your affiliate, and principal owner, Cathy Benedict, is selling border collies for the purpose of goose control. This evidence is clear and is not subject to dispute. The evidence demonstrates that Ms. Benedict is engaged in a business that: "(a) offers products or services which involve the inhabitation of property by, and control of, birds and waterfowl; and (b) is . . . located at or within the county or municipality in which the Approved Location is located and within the Protected Territory . . ."

Sections 14.2 and 14.2.7 of the Franchise Agreement provide, in part, as follows:

> "14.2   Upon the occurrence of any of the following events of default, Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee (in the manner provided under Section 21 hereof):
>
>> 14.2.7  If Franchisee fails to comply with the covenants in Section 16.2 hereof or fails to obtain execution of the covenants required under Sections 9.2 or 16.7 hereof;"

Thus, the conduct of business involving the sale of border collies for goose control in Leesburg, Virginia is a violation of Section 16.2.3 of the Franchise Agreement. That violation creates an event of default that, under Section 14.2.6, provides Franchisor with the right to terminate the Franchise Agreement immediately without any opportunity to cure the default.

**<u>Therefore, please be advised that the Franchise Agreement is hereby terminated effective immediately</u>**.

4813-4049-5708, v. 1

Doggone Geese, Inc.
February 8, 2018
Page -3-

As a result, Section 15 – <u>OBLIGATIONS UPON TERMINATION OR EXPIRATION</u>, becomes applicable to you.  Section 15 provides as follows:

"Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

15.1    Franchisee shall immediately cease to operate the Franchised Business, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.

15.2    Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System; and the Proprietary Mark "Geese Police" and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System.  In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, products, and any other articles which display the Proprietary Marks.

15.3    Franchisee shall take such action as may be necessary to cancel any assumed name registration or equivalent registration obtained by Franchisee which contains the mark "Geese Police" or any other Proprietary Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within five (5) days after termination or expiration of this Agreement.

15.4    Franchisee shall make such modifications or alterations to the Premises of the Franchised Business (including, without limitation, the changing of, and the assigning to Franchisor of, the telephone number) and to any vehicles used in connection with the Franchised Business immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the Premises and any such vehicles of the Franchised Business from that of the premises and the vehicles of a franchised business under the System, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this Section 15.4, Franchisor shall have the right to enter upon the Premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes to the Premises and to any vehicles as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

15.5    Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in Franchisor's sole discretion, is likely to cause confusion, mistake, or deception, or which, in Franchisor's sole discretion, is likely to dilute Franchisor's rights in and to the Proprietary Marks.  Franchisee further agrees not to utilize any designation of origin, description, or representation (including but not limited to reference to the Franchisor, the System, or the Proprietary Marks) which, in

Doggone Geese, Inc.
February 8, 2018
Page -4-

Franchisor's sole discretion, suggests or represents a present or former association or connection with Franchisor, the System, or the Proprietary Marks.

15.6    Franchisee shall promptly pay all sums owing to Franchisor and its affiliates.  In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid-in-full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee and used in the operation of the Franchised Business.

15.7    Franchisee shall immediately deliver to Franchisor the Customer List relating to the Franchised Business, which are acknowledged to be the property of Franchisor, and shall retain no copy or record of any such customer lists.  At the option of Franchisor, Franchisee shall assign to Franchisor all of the contracts with customers of the Franchised Business.  In addition, Franchisee shall immediately deliver to Franchisor the Manual and all other records, correspondence, and instructions containing confidential information relating to the operation of the Franchised Business (and any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor, and shall retain no copy or record of any of the foregoing, with the exception of Franchisee's copy of this Agreement, any correspondence between the parties, and any other documents which Franchisee reasonably needs for compliance with any provision of law.

15.8    Franchisor shall have the option, to be exercised within thirty (30) days after termination, to purchase from Franchisee (1) any or all of the dogs and vehicles used by the Franchised Business and any or all of the equipment and signs related to the operation of the Franchised Business, at fair market value or at Franchisee's depreciated book value, whichever is less and (2) any or all supplies and inventory of the Franchised Business, at Franchisee's cost or depreciated book value, whichever is less.  If the parties cannot agree on the price of any such items within a reasonable time, an independent appraisal shall be conducted at Franchisor's expense, and the appraiser's determination shall be binding.  If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee, and the cost of the appraisal, if any, against any payment therefor.

15.9    Franchisee shall comply with the covenants contained in Section 16.3 of this Agreement.

15.10   Upon termination of this Agreement:  (i) by Franchisor following Franchisee's default; or (ii) by Franchisee prior to the end of its term without Franchisor's consent, Franchisee agrees to pay to Franchisor within fifteen (15) days after the effective date of this Agreement's termination, in addition to the amounts owed hereunder, liquidated damages equal to the present value (using the then-current 30-Year Treasury Bond rate) of the royalty fees Franchisee would have paid, calculated as the product of:

Doggone Geese, Inc.
February 8, 2018
Page -5-

       a.     The Franchised Business' average monthly Gross Sales during its most recent twelve (12) months of operation before the termination (annualized if this Agreement has been in effect less than twelve (12) months at such time), multiplied by the lesser of the number of months remaining in this Agreement had it not been terminated, or thirty-six (36); and

       b.     the six percent (6%) royalty rate.

The parties hereto acknowledge and agree that it would be impracticable to determine precisely the damages Franchisor would incur as a result of termination of this Agreement and the loss of cash flow from royalty fees due to, among other things, the complications of determining what costs, if any, Franchisor might have saved and how much the royalty fees would have grown over what would have been this Agreement's remaining term. The parties hereto consider this liquidated damages provision to be a reasonable, good faith pre-estimate of those damages and the parties acknowledge and agree that such amount does not constitute a penalty."

In addition, Section 16.3 becomes applicable to you and provides as follows:

"16.3   Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not, for a continuous uninterrupted period of two (2) years commencing upon the date of: (a) a transfer permitted under Section 13 of this Agreement; (b) expiration of this Agreement; (c) termination of this Agreement (regardless of the cause for termination); (d) a final order of a duly authorized arbitrator, panel of arbitrators, or a court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Section 16; or (e) any or all of the foregoing; either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that: (i) involve the inhabitation of property by, and control of, birds and waterfowl; and (ii) is, or is intended to be, located at or within:

       16.3.1  the county or municipality in which the Approved Location is located; or

       16.3.2  the Protected Territory; or

       16.3.3  one hundred fifty (150) miles of the Approved Location; or

       16.3.4  one hundred fifty (150) miles of any business operating under the Proprietary Marks; provided, however, that this provision shall not apply to the operation by Franchisee of any business under the System which may be franchised by Franchisor to Franchisee."

Franchisee now has 15 days in which to cease the conduct of the Franchised Business and to perform the obligations described in Sections 15 and 16.3.

Doggone Geese, Inc.
February 8, 2018
Page -6-

The post-termination provisions of the Franchise Agreement are clear and self-explanatory.  Please read Sections 15 and 16.3 carefully and perform the obligations described within the next 15 days.

At the end of the 15-day period, Franchisee must send to Franchisor evidence in the form of a sworn statement indicating that Franchisee has:

    (a)    Ceased all operations of the Franchised Business;

    (b)    Returned its Customer List, the Manual and all other records, correspondence, and instructions containing confidential information relating to the operation of the Franchised Business (and any copies thereof) to Franchisor;

    (c)    Assigned all Franchisee's contracts with its customers to Franchisor;

    (d)    Ceased all use of the Proprietary Mark "Geese Police" and all other Proprietary Marks and distinctive forms, slogans, signs, symbols, and devices associated with the System; and

    (e)    Cancelled any assumed name registration or equivalent registration obtained by Franchisee which contains the mark "Geese Police" or any other Proprietary Marks;

In addition, under Section 15.10 of the Franchise Agreement, Franchisor has calculated the amount of **$18,089.53** as the liquidated damages due Franchisor.  This amount must be paid to Franchisor within the same 15-day period.

In the event that you do not undertake the actions being demanded in this letter and provide sufficient evidence that you have complied with your post-termination obligations, Franchisor will take whatever lawful actions it deems necessary to protect its interests, including without limitation, filing legal action against you.

**NOTICE HAS BEEN GIVEN.  PLEASE ACT ACCORDINGLY.**

Very truly yours,

David C. Marcks
Managing Member

Enclosures (photos)
cc:    Lisa Groat, Manager of Franchise Operations
       John R. Previs, Esquire



**.ıll** AT&T  4G  ⚙  10:36 AM  ✈ ✳ 🔋 ⚡

Touch to return to Navigation

‹      **goosedogsforsale**      •••



**120**    **113**    **156**
posts    followers    following

Message    👤✓ 

**Goosedogs In Action**
Product/Service
Cathy Benedict. Goosedogs for sale in
Leesburg VA for humane Canada goose
control. Over 2 decades of experience
www.keepstonefarm.com/
Leesburg, Virginia

Call      Email      Directions



⌂     🔍     ⊕     ♡    



goosedogsforsale

27 views

**goosedogsforsale** Young Ian is turning into quite the goosedog!! #workingdog #workingbordercollie #geesepolice



.ıll AT&T  4G            10:45 AM            ◢ ✳ ▭ ⚡
Touch to return to Navigation

Q  Goosedogs For Sale Vi...    •••

 Goosedogs For Sale Virginia

 Like    Follow    Share    Save

Agriculture • Leesburg, Virginia

HOME     POSTS     REVIEWS     VIDEOS

            ≡



HOME    POSTS    REVIEWS    VIDEOS

 **Goosedogs For Sale Virginia**    • • •
3 hrs · Instagram · 🌐

Young Ian is exhausted after a day of herding geese, ducks and sheep at our training farm in Berryville Va **#keepstonefarm**, **#goosedogs #workingbordercollie #dogsofinstagram #goosedogsforsale #golf**



            



HOME          POSTS          REVIEWS          VIDEOS

 **Goosedogs For Sale Virginia**   ...
Yesterday at 4:05 PM · 🌐

Britt may be tiny, but so is a small amount of dynamite!! This 6 year old is full of drive for birds! **#goosedogsforsale**, **#golf**, **#dogsoffacebook**, **#bordercollie**



            



.ıll AT&T 4G          10:46 AM

**Touch to return to Navigation**

<    Q Goosedogs For Sale Vi...          •••

'S    **PHOTOS**    ABOUT    **COMMUNITY**



## Goosedogs For Sale Virginia
258 mi away

 PO Box 2608
Leesburg, Virginia    Get Directions

 (703) 785-2803    Call Now

 http://www.keepstonefarm.com

 About
Properly trained duck demo and
goosedogs for sale for the humane control
of Canada geese. We can personally deliver
your dog, fly it or have you come to us

 **Team Members**

 **Cathy Benedict** 

    

# DEX 5



Attorneys:
Dirk McClanahan (VA)(DC)
Robert Powers (VA)(DC)
Zach Miller (VA)(DC)
Trevor Pusch (VA)

**Telephone:** (703) 520-1326
**Facsimile:** (703) 828-0205

**Virginia Office:**
8133 Leesburg Pike
Suite 130
Vienna, VA 22182

**Email:** contactus@mcplegal.com
**Web:** www.mcplegal.com

**D.C. Office:**
1717 Pennsylvania Ave. NW
Suite 1025
Washington, D.C. 20006

February 22, 2018

**SENT VIA U.S. Mail First Class and Email to:**
GPI, LLC
C/o John R. Previs, Esq.
One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-140
John.previs@tipc.com

> **Re:   Notice of Representation; Cathy Benedict and Doggone Geese, Inc.**

Dear Mr. Previs:

Please take notice that Cathy Benedict ("Benedict") and Doggone Geese, Inc. ("DG") are represented by our law firm, McCLANAHAN POWERS, PLLC. Please direct all future communication and correspondence to our firm. The purpose of this letter is to address and formally respond to your client's letter, GPI, LLC ("GPI") dated February 8, 2018.

Your letter on February 8, 2018 alleges that our client is in violation of the Franchise Agreement (the "Franchise Agreement" or "FA") for the actions of Cathy Benedict selling border collies for the purpose of goose control allegedly in violation of FA at 16.2 and 16.2.3. After review of the FA, the FM (defined below), your letter, and the facts surrounding this matter, our client is not in violation of the FA and this assertion is being brought by GPI, LLC as a result of the independent personal relationships of its owners and not with a sincere belief that there has been a violation. The February 8, 2018 letter also incidentally cited 16.2.1. However, there does not appear to be any facts alleged indicating any effort by DG to divert business from Franchisor, or, to injure the goodwill of the Proprietary Marks and the System. As such, unless more information or explanation is provided, we believe the sole issue is the one identified herein.

**Cathy Benedict Is not a Party to the FA:**

The allegation in your letter is that Cathy Benedict sold dogs. A review of the FA indicates that Franchisee is defined only as DG. See FA at pg. 1 (preamble). There is no independent reference to Cathy Benedict and/or any inclusive definition identifying Franchisee to mean its owners, portion of owners, subsidiaries, etc. The only potential reference is in a potential Exhibit identified as Exhibit C. Our client does not have an executed copy of Exhibit C and does not believe it was executed. If you have a fully executed copy please provide it. In addition, assuming arguendo a fully executed Exhibit C exists, the FA has been renewed approximately every five years. We have a copy of the renewal and it appears to be signed only by DG and not renewed by Cathy Benedict as guarantor.

NJ law is clear on the issues of modifications and renewals, "[t]hus, we agree with the *Restatement* rule that a modification of the obligation between the principal obligor and the obligee

does not discharge the secondary obligor unless "the modification creates a substituted contract or imposes risks on the secondary obligor fundamentally different from those imposed pursuant to the transaction prior to modification...." *Restatement (Third) of Suretyship and Guaranty* § 41(b)(i)(1996). Noting that the traditional rule, that a secondary obligor was completely discharged by a modification of the underlying obligation, "was often applied in a mechanical, almost mindless way," the *Restatement* chose to adopt "the more modern policy ... of discharging the secondary obligor only to the extent it would otherwise suffer loss as a result of the modification." *Ibid.* (Reporter's Note). *See In re Meyer,* 120 *F.*3d 66, 71 (7th Cir.1997); *411 American Oil Co. v. Valenti,* 179 *Conn.* 349, 426 *A.*2d 305, 308 (1979); *Friedman v. Millpit Corp.,* 49 *Conn.App.* 354, 713 *A.*2d 1288, 1290 n. 3 (1998), *certif. denied,* 247 *Conn.* 925, 719 *A.*2d 1168 (1998) (quoting *Restatement* ); *Bumila v. Keiser Homes of Maine, Inc.,* 696 *A.*2d 1091, 1094 (Me.1997); *Lloyd Corp. v. O'Connor,* 258 *Or.* 33, 479 *P.*2d 744, 746, (1971); *Austin Hardwoods Inc. v. Vanden Berghe,* 917 *S.W.*2d 320, 326 (Tex.App.1995) ("A material alteration is an alteration of the underlying debt that either injures or enhances the risk of injury to the guarantor") (citing *United Concrete Pipe Corp. v. Spin–Line Co.,* 430 *S.W.*2d 360, 365–66 (Tex.1968).)" quoting *Ctr. 48 Ltd. P'ship v. May Dep't Stores Co.,* 355 N.J. Super. 390, 410–11, 810 A.2d 610, 622 (App. Div. 2002)

Under the present situation, to our knowledge Cathy Benedict did not personally agree to any modification/renewal, and, any such modification would have adversely impacted her directly as, in the present case, GPI would try and argue she was bound by additional time on a restrictive covenant (which we argue below is unenforceable as a matter of public policy).

As such, as used in the FA 'Franchisee', simply means DG. As such, the actions or inactions of Cathy Benedict are irrelevant to the FA, unless GPI, LLC can assert that they were done on behalf of or within the scope of DG. However, in the present case, Cathy Benedict is not selling dogs through or on behalf of DG. In fact, the entity used is entirely distinct, as it directs interested parties to www.keepstonefarm.com. There is no affiliation, partnership, or financial arrangement between DG and Keepstone Farm's sale of dogs. To that end, absent any additional information, there is no legal basis for this allegation and attempted termination of DG's FA.

**Restrictive Covenant 16.2.3 is confusing and ambiguous:**

As an initial matter, 16.2.3 is an extremely confusing provision. It is riddled with a myriad of restrictive and nonrestrictive clauses, parentheticals, and subparts. Specifically regarding the restrictive and/or nonrestrictive clauses, one reading of this restrictive covenant, appears to indicate that the restriction on the type of business has two conditions 1.) it only applies to business that controls birds and waterfowl, and, 2.) that it only applies to business involving inhabitation of birds and waterfowl. An alternate reading is that 1.), identified above, is a nonrestrictive clause and that the restriction should simply be interpreted as restricting business involving inhabitation of birds and waterfowl. Regardless, the provisions drafting makes it difficult for the Franchisee to comprehend and know the full nature and extent of the covenant.

**Restrictive Covenant 16.2.3 violates public policy under NJ law:**

For the sake of putting this matter to a complete and final conclusion, we are going to pretend, and assume arguendo that GPI has a factual and/or legal basis for submitting a letter attempting to terminate the FA with DG. However, even if DG sold dogs, which it did not, this assertion is without merit.

Generally, New Jersey courts will only enforce restrictive covenants if they are reasonable in scope and duration (Community Hosp. Group, Inc. v. More, 869 A.2d 884, 897 (N.J. 2005)). As New Jersey disfavors restraints on trade, restrictive covenants are narrowly construed (J.H. Renarde, Inc. v. Sims, 711 A.2d 410, 416 (N.J. Super. Ct. Ch. Div. 1998)).

A [restrictive covenant] is reasonable [] if it: (1) protects legitimate interests of the employer; (2) does not impose an undue hardship on the employee; and (3) is not injurious to the public. *Ibid.* Yet, "[e]ven if the covenant is found enforceable, it may be limited in its application concerning its geographical area, its period of enforceability, and its scope of activity" under what is known as the "blue pencil" rule. Kadi v. Massotto, No. A-2555-07T2, 2008 WL 4830951, at *8 (N.J. Super. Ct. App. Div. Nov. 10, 2008)   Here, the *Solari/Whitmyer* test is applicable. *See Laidlaw, Inc. v. Student Transp. of Am.,* 20 *F.Supp.*2d 727, 754 (D.N.J .1998) (finding the *Solari/Whitmyer* test applicable to determine whether a noncompete agreement ancillary to the sale of a business is enforceable); *Graziano v. Grant,* 326 *N.J.Super.* 328, 344-45 (App.Div.1999) (the court "perceive[d] no difference between a covenant ancillary to an employment agreement and a covenant ancillary to the sale of a medical practice," finding the same three-prong *Solari/Whitmyer* test applicable to determine whether the covenant was enforceable). Kadi v. Massotto, No. A-2555-07T2, 2008 WL 4830951, at *8 (N.J. Super. Ct. App. Div. Nov. 10, 2008)

Pursuant to 16.2.3, a Franchisee cannot "own, maintain, operate, engage in, be employed by, provide any assistance to, or have any interest in (as owner or otherwise) any business that:" FA 16.2.3. The most obvious over reach is that they cannot ''provide any assistance to" As a result, the plain language of this provision would prevent a Franchisee from providing a totally unrelated service, even if distinct, to a business. For example, FedEx very likely provides shipping services to a company that meets either of the ambiguous definitions identified above. However, they can't work for FedEx because they provide assistance to these businesses. Franchisees would not be able to work in residential or commercial development and/or construction businesses as they 'involve' the inhabitation of waterfowl and birds. An infinite number of examples can be identified and used to highlight that this language is facially overbroad. The language of this provision simply goes well beyond protecting the legitimate interests of the Franchisor.

The restrictive covenant is even more absurd when assessed against the geographic scope. This restriction is not simply limited to the Franchise Territory of the particular Franchisee. Instead, it is applicable to all territories of any business operating under the Proprietary Marks; however, it goes even further, in that you cannot operate within 150 miles of these territories. These territories are collections of districts and counties. The territories alone are hundreds of square miles. Adding a surrounding radius of another 150 miles to all territories is absurd. In DG's case they have been operating in this field for over ten years. This goes well beyond protecting legitimate business interests and is designed to simply stymie competition. It is a violation of public policy under NJ law.

**Selling Border Collies is not Competitive to GPI, LLC:**

GPI, LLC is not in the business of selling dogs. In fact, their ownership and management has been routinely quoted saying "we are not in the business of selling dogs." None of the franchisees sell dogs. As a result, the sale of dogs is not part of their products or services and is inherently not competitive to GPI, LLC.

Upon review of the Franchise Manual dated April 19, 2012, as amended May 29, 2012 ("Franchise Manual" or "FM"), under the heading ITEM 5: INITIAL FEES, it is identified that the company purchases dogs from other providers and that there is no additional consideration or value

obtained from this purchase. See FM at pg. 4 ("We do not receive any money or other consideration as a result of your purchase of these dogs from a breeder specified by us."). Finally, under ITEM 12 subheading Exclusive Rights, it identifies that GPI has the unilateral ability to expand whether similar or dissimilar any and all services and products, including channels of distribution. See FM pg. 23. As such, any noncompetition covenant without a placeholder in time as of the date of the entry or termination is inherently illusory and overbroad.

**Please treat this letter as formal notice of potential litigation. Take care to ensure that no information was or is deleted, destroyed, or otherwise disposed of. Spoliation of evidence is actionable when: (1) a party fails to preserve evidence that it has a duty to preserve; (2) the evidence is material to the case; and (3) the failure to preserve the evidence causes other parties prejudice. At this time, this notice is intended for both GPI, LLC and its owners.**

Currently, we are reviewing and assessing the legal claims available to DG as a result of this letter. This letter appears motivated by a dislike of the GPI, LLC owners of the DG owner and not by any concern for the actual merits or violations asserted. As such, we are investigating the potential for claims of conspiracy and tortious interference by the owners of GPI, LLC in addition to the inclusion and acts of GPI, LLC directly.

However, in an effort to resolve this matter, our client has authorized us to make the following offers:

Option 1:



Option 2:



These proposed offers are subject to and conditioned upon a mutually agreeable release and settlement agreement outlining all terms herein.

In the interim, as the parties continue to discuss and finalize a resolution, we intend to continue operating uninterrupted, including but not limited to servicing customers and making payments to Franchisor for revenue received. As a result, we would intent to proceed this way until the matter is resolved by settlement or adjudication. Please advise if this is agreeable.

Further, this is an attempt to resolve a dispute, and our client reserves the right to assert additional facts, defenses, and legal theories, as appropriate. This letter is offered for settlement purposes only and is without prejudice to any of our client's rights.

If we do not receive a signed Agreement from you within **fourteen (14) days** from the date this letter, we will assume that you do not desire to resolve this issue amicably. Further, we will immediately proceed with taking steps to enforce and protect our client's rights.

Please do not hesitate to reach me by either the phone number above or e-mail address provided below.

Sincerely,

_/s/ Dirk McClanahan_____

Dirk McClanahan, Esq.
dmcclanahan@mcplegal.com

# DEX 6

# Buchanan Ingersoll & Rooney PC

One Oxford Centre
301 Grant Street, 20th Floor
Pittsburgh, PA 15219-1410
T 412 562 8800
F 412 562 1041
www.blpc.com

**John R. Previs**
412 562 8957
john.previs@blpc.com

March 6, 2018

**SENT VIA U.S. MAIL**
**First Class and email to:**

Dirk McClanahan, Esquire
McClanahan Powers, PLLC
8133 Leesburg Pike
Suite 130
Vienna, VA 22182
dmclanahan@mcplegal.com

  Re: Franchise Agreement by and between GPI, LLC and Doggone Geese, Inc.
     dated August 31, 2009 (the "Franchise Agreement")

Dear Mr. McClanahan:

  Reference is made to your letter dated February 22, 2018. Your client is contesting the termination of the Franchise Agreement and the enforcement of the post-termination obligations.

  Despite your client's position, the Franchise Agreement has been terminated.

  By this letter, we are formally notifying you that Ms. Cathy Benedict and Doggone Geese, Inc. have an obligation to preserve all electronic information, including electronic information on websites and Twitter accounts, as well as hard copy documents relative to your franchise relationship with GPI, LLC, the termination of the franchise relationship and the businesses operated by Ms. Benedict in selling dogs.

  Finally, in order to clarify one factual matter, I have attached Exhibit C to the Franchise Agreement (Guarantee, Indemnification and Acknowledgment) executed by Ms. Benedict, Individually.

       Very truly yours,

       John R. Previs

Attachment
4831-1728-8270, v. 1

**EXHIBIT C**

**GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT**

As an inducement to GPI, LLC ("Franchisor") to execute the Franchise Agreement between Franchisor and Dog Gone Geese, Inc. d/b/a Geese Polices of Virginia ("Franchisee") dated August 31, 2009 (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon demand by Franchisor, the undersigned will immediately make each payment required of Franchisee under the Agreement. The undersigned hereby waive any right to require Franchisor to:  (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify, and hold Franchisor and its affiliates harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation, court costs, and arbitration fees and expenses) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the covenants contained in Sections 9, 15, 16, 20 and 24 of the Agreement.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement, and shall be interpreted and construed in accordance with Section 24 of the Agreement. This Guarantee shall be interpreted and construed under the laws of the State of New Jersey, notwithstanding any conflict of laws rules.

The Guarantors agree that the dispute resolution and attorney fee provisions in Section 24 of the Agreement are hereby incorporated into this Agreement by reference, and references to

1

"Franchisee" and the "Franchise Agreement" therein shall be deemed to apply to "Guarantors" and this "Guarantee", respectively, herein.

Any and all notices required or permitted under this Guarantee shall be in writing and shall be personally delivered, sent by registered mail, or sent by other means which afford the sender evidence of delivery or rejected delivery, to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:     GPI, LLC
                           126 South Main Street
                           Farmingdale, New Jersey 07727
                           Attn: Ms. Dianne Neveras

Notices to Guarantors:     Dog Gone Geese, Inc.        **REDACTED**
                           P.O. Box 2608,
                           Leesburg, VA 20175
                           Attn: Cathy Fiddler  Benedict

Any notice by a method which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given at the date and time of receipt or rejected delivery.

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

GUARANTORS

_Cather Benedict_
Name                    **REDACTED**

_____
Social Security Number      **REDACTED**

Residence Address  Leesburg VA 20175

STATE OF_____)
                )
COUNTY OF_____)

Personally appeared before me this ____ day of _____, 20____,
and _____, to
me known to be the persons who executed the foregoing Guarantee.

Notary Public: _____

(NOTARY SEAL)              My Commission Expires:_____

NICOLE SUSN JEFFERS
Commission # 2392694
Notary Public, State of New Jersey
My Commission Expires
January 12, 2016

2

DEX 7

**GPI, LLC**

*Franchise Administrator for*

**GEESE ✹ POLICE**

Phone: (732) 938-9093 • Fax: (732) 938-9092
P.O. Box 656 • Howell, NJ 07731

March 19, 2018

ATTENTION:    All Geese Police Franchise Offices

Re:    Franchise Agreement between GPI, LLC and Geese Police of Loudon

Dear All Franchise Owners:

Please accept this notice as a formal announcement that the Franchise Agreement with one of our franchisees, Doggone Geese Inc. d/b/a Geese Police of Loudon (Cathy Benedict, owner), has been terminated because of a breach of the in-term non-competition provisions contained in the Franchise Agreement.

Ms. Benedict has been selling border collies for her own account and those sales adversely impact our ability to sell our franchises.

The terms of our Franchise Agreement prohibit such competitive activity, and the failure to comply with those terms led to the termination of the Franchise Agreement.

From this day forward, if you have any communications with Ms. Benedict, please be sure to limit the communication to topics that will not constitute a breach of your Franchise Agreement with us.

I ask for your office to direct any questions or concerns to me personally at 732-433-3471.

Continued success with my best regards.

*David C. Marcks*
President & Founder

# DEX 8


**Geese P**
about 3 mo

# GEESE POLICE GET RID OF CANADA GEESE HUMANELY USING WORKING BORDER COLLIES, BIRD CONTROL

Geese Police, Inc.® has been providing quality goose/bird control for over 25 years. It is our mission to provide you the most effective environmentally safe Canada goose control service possible, using working Border Collies and other special techniques. Geese Police, Inc. is the best when it comes to wildlife control and pest solutions for Canada geese.

Geese Police® utilizes techniques perfected to have efficient and long lasting results. Geese Police® handpicks only the best highly trained working Border Collies. These trained dogs play a crucial role in controlling the Canada geese on our clients' properties.

Geese Police® handlers are specially trained to work with and properly control our dogs using special techniques. Handlers are educated on the behavior of Canada geese and their migratory, nesting and breeding habits. With this training they are also able to educate the public ensuring the most successful goose control program available.

We are constantly keeping up with the latest developments in the migration habits of Canada geese and the problems they cause to the health of humans and the environment.

Contact us today for your free, no obligation demonstration!

**Geese Police, Inc. Canada Goose Control**

Franchises now Available across the country!

# AS SEEN ON:

    

© 2012 GeesePoliceInc.com | 866-NO-GEESE (664-3373)
PO Box 656 Howell, New Jersey 07731

E-Mai
GPI, LLC Fra

# DEX 9





**Google** | renew

All    News    Images    Shopping    Maps    More              Settings    Tools

About 72,000,000 results (0.53 seconds)

Dictionary

Enter a word, e.g. "pie"

## re·new

/rəˈn(y)o͞o/

*verb*

- resume (an activity) after an interruption.
  "the parents renewed their campaign to save the school"
  *synonyms:* resume, return to, take up again, come back to, begin again, start again, restart, recommence;  More

- re-establish (a relationship).
  "he had renewed an acquaintance with McCarthy"

- repeat (an action or statement)
  "detectives renewed their appeal for those in the area at the time to contact them"
  *synonyms:* reaffirm, reassert;  More

Translations, word origin, and more definitions

*Feedback*

**Renew | Definition of Renew by Merriam-Webster**
https://www.merriam-webster.com/dictionary/renew ▾
intransitive verb. 1 : to become new or as new. 2 : to make a **renewal** (as of a contract)
Examples of renewable in a ... · Renewable Fuse · Renewal



**Eden Body Renewal**
4.2          (5) · Spa
Tysons Galleria
McLean, VA · (703) 448-6044

**Renew Laser And Skin**
No reviews · Skin Care Clinic
Arlington, VA · (703) 270-9004
Open · Closes 8PM

**ReNew Therapeutic Massage Center**
4.8          (29) · Massage Therapist
Rockville, MD  (301) 230-6555
Closed · Opens 10AM Tue

≡ More places

**Renew Synonyms, Renew Antonyms | Thesaurus.com**
www.thesaurus.com/browse/renew ▾
**renew** 1382, from re- "again" + M.E. *newen* "resume, revive, renew," on analogy of L. *renovare*. Renewable
is recorded from 1727; in ref. to energy sources, it is attested from 1971

# DEX 10

*Franchise Administrator for*

# GEESE ✪ POLICE

Phone: (732) 938-9093 • Fax: (732) 938-9092
P.O. Box 656 • Howell, NJ 07731

March 19, 2018

[Customers of Doggone Geese, Inc.]

Re:   GEESE POLICE® — Geese Control Services

Ladies and Gentlemen:

We are the franchisor of the Geese Police® franchise system.

One of our franchisees, Doggone Geese, Inc. (Cathy Benedict, owner), has been providing you with geese control services under our brand, GEESE POLICE®, pursuant to a Franchise Agreement with us (the "Franchise Agreement").

The Franchise Agreement was terminated recently, and Doggone Geese, Inc. is no longer permitted to provide geese control services in your area under the trademark GEESE POLICE®.

We, as the franchisor, want to be sure you have uninterrupted service. We are willing to assume the obligation to deliver geese control services to you, and we are prepared to do so.

Please contact me at 732-433-3471, and I will make arrangements with you to provide geese control services to you.

David C. Marcks
President & Founder

# DEX 11



**GPI, LLC**
*Franchise*
*Administrator*



**GEESE POLICE ®**

P.O. Box 656 • Howell, NJ 07731
866-NO GEESE (664-3373)
www.geesepolice.com
franchises@geesepolice.com

December 6, 2017

Cathy Benedict
P.O. Box 2608
Leesburg, VA 20177

Re: Audit

Ms. Benedict

*As* a result of the audit of the financials for Doggone Geese Inc. we found a few minor discrepancies. In addition it has come to our attention you are not issuing 1099's to the necessary vendors which is mandated by the Internal Revenue Service.
In the interest of preserving the existing business relationship, we are willing to overlook the discrepancies and the lack of 1099's contingent on the following:

- You must issue 1099's annually
- You will not sell any more dogs advertised as Geese Police trained You will not sell any more of your territory
- You will adhere to the rules and regulations outlined in your franchise agreement

We look forward to a successful and cohesive working relationship from here on out.

We will await your response.

Sincerely,

David Marcks
President

Diane Marcks
Vice President

DEX 12

# Financial Audit Letter and Agreement

## Cathy Benedict

Tue 12/19/2017 7:40 AM

To:Groat <lisa.groat@geesepolice.com>;

Cc:Cathy Benedict <cathy@geesepoliceloudoun.com>;

Good morning.  Can you please forward this to Dave and Dianne:

In response to the financial audit letter from them date December 6, 2017, I agree to:

- Issue 1099's annually
- Not sell any more dogs advertised as Geese Police
- Adhere to the rules and regulations outlined in my franchise agreement

I also look forward to a successful and cohesive working relationship from here on out.

Sincerely,


Cathy P. Benedict, President
Geese Police of Loudoun
703-777-5117
www.GeesePoliceLoudoun.com
"Call Us to Get the Flock Out!"
*Celebrating 19 years of being the best!*